CUMBERLAND TELEPHONE & TELEGRAPH CO. v. CITY OF LOUIS-
VILLE.

(Circuit Court, W. D. Kentucky. April 25, 1911.)

1. EQUITY (§ 409*)—FINDINGS OF MASTER—WEIGHT.
   In a suit to enjoin the enforcement of a law or ordinance as unconstitutional, the findings of a master are not entitled to the weight usually accorded to them in ordinary equity suits, but, since the validity of the action of a legislative body is involved, it is the duty of the court to give its own full consideration to the facts as well as the law.
   [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 920–923; Dec. Dig. § 409.*]

2. INJUNCTION (§ 85*)—REGULATION OF RATES OF PUBLIC SERVICE CORPORATION—RIGHT TO RELIEF—BURDEN OF PROOF.
   While it is the duty of a court to enjoin the enforcement of rates prescribed by a law or ordinance to be charged by a public service cor-

poration which are so low as to deprive it of a fair return on its investment, as violative of its constitutional rights, the confiscatory effect of such rates must be clearly shown to warrant such relief.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 155, 156; Dec. Dig. § 85.*]

3. Telegraphs and Telephones (§ 33*)—Ordinance Regulating Telephone Rates—Constitutionality—Valuation of Property.

In a suit by a telephone company to enjoin the enforcement of an ordinance prescribing rates as confiscatory and unconstitutional, the value of complainant's property on which it is entitled to earn a fair return is the reasonable value of the property being used for the public at the time the question arises, regardless of its original cost, which may be helpful as evidence of its present value, but is not conclusive, especially where the plant has been in operation for many years.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 33.*]

4. Telegraphs and Telephones (§ 33*)—Ordinance Regulating Rates—Constitutionality—Valuation of Property.

In a suit by a telephone company to enjoin the enforcement of an ordinance fixing rates on the ground that the rates established thereby are so unreasonably low as to be confiscatory, in determining the value of the company's property which is devoted to the public use, it is proper to include a reasonable amount of working capital and also of supplies kept on hand, but the company's franchise and rights of way, where they were granted by the city without payment, although valuable, may properly be left out of account as a separate item of value, being necessarily taken into consideration to some extent in the valuation of the plant as a whole. The real estate owned by the company and devoted to its business is a part of the plant, and its value should be included.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 33.*]

5 Telegraphs and Telephones (§ 33*)—Ordinance Regulating Rates—Constitutionality.

A telephone company *held* entitled to set aside from its gross earnings annually a sum equal to 7 per cent. of the value of its property devoted to public use in a city, exclusive of its real estate, working cash capital and supplies on hand, to cover depreciation and maintain its property in effective condition, and to earn a net revenue equal to 7 per cent. on all of its property, where it had serious opposition, and an ordinance which so reduced its rates that it evidently could not make such earnings *held* confiscatory and its enforcement enjoined.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 33.*]

6. Words and Phrases—"Depreciation."

"Depreciation" is the loss in value of some destructible property over and above current repairs.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 3, p. 2007.]

In Equity. Suit by the Cumberland Telephone & Telegraph Company against the City of Louisville. Decree for complainant.

W. L. Granbery and A. P. Humphrey, for complainant.
Clayton B. Blakey, City Atty., and Huston Quin, Asst. City Atty., for defendant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

EVANS, District Judge. The complainant, which we shall call the company, in February, 1909, was charging the following rates for services in the city of Louisville:

### Business.

#### Within the two mile radius of nearest exchange.

| | | |
|---|---|---|
| Private metallic............................................$8.00 | per month |  |
| 2-station metallic......................................... 5.00 | " | " |
| Public pay station (coin device) private.................... 4.00 | " | " |
| (Agent's service free out and in, and divide with any cash deposits for local city calls.) | | |
| City and county telephones within city limits............... 4.00 | " | " |

#### Residence.

| | | |
|---|---|---|
| Private, within city limits................................ 4.00 | " | " |
| Private, beyond city limits and within three miles of nearest exchange ............................................... 4.50 | " | " |
| 2-station, within city limits.............................. 3.00 | " | " |
| 2-station, beyond city limits and within three miles of nearest exchange.......................................... 3.50 | " | " |
| Extension set.............................................. 1.25 | " | " |

#### Country Rates.

|  |  | | |
|---|---|---|---|
| Private Metallic | Business or residence—add to the exchange rate 50c per month, per mile, or fraction thereof, if subscribers are located beyond the exchange radius. Exchange radius for business is two miles—for residence, three miles—from nearest Louisville exchange. | | |
| 4-party Metallic | Business or residence—add to the exchange radial rate 25c per month, per mile, or fraction thereof, if the subscriber is located beyond the exchange radius. For exchange radius, see above. | | |
| Extension set........................................... 1.25 | | " | " |

A discount of 50 cents per month is allowed on all rates above enumerated if rental is paid quarterly in advance.

Private line instruments $12.00 per year, per instrument, to which is added mileage charge of $30.00 per mile, per annum.

| | | | |
|---|---|---|---|
| Extension bells (business or residence)................net $0.15 | per month |  |
| Joint user (business).................................... " 1.00 | " | " |
| List (business).......................................... " .25 | " | " |
| List (residence)......................................... " .25 | " | " |
| Loud ringing extension gongs............................. " .25 | " | " |
| Buzzers and push buttons................................. " .25 | " | " |

The defendant in its answer says "that the rate ordinance, referred to in paragraph 4 of the bill, was passed after as thorough and complete investigation as the authorities of the city of Louisville were able to make; that said investigation was based on the reports made by the complainant to the Louisville Board of Trade, on the published annual and monthly reports made by the complainant wherein the operations and other facts in connection with the telephone system of said complainant company were detailed, and on the facts gathered from the telephone directory issued by the complainant, and on a comparison of the respective charges, operations, property, receipts, and operating expenses of the complainant company and the Louisville Home Telephone Company." Though the burden in respect to

these allegations rested upon the city they were left wholly unproved. No testimony whatever was offered in their support, vague and general as they are. No member of the legislative body which enacted the ordinance presently to be noticed was called as a witness. The then mayor did testify on behalf of the city, but did not allude to the subject. He, as well as two other officials, confined their statements to the condition of another company which appears to have been then seeking some relief in the way of legislation. So that we may fairly say that, without making any adequate inquiry into the real facts upon which such action could intelligently be based, the defendant, which we shall call the city, on February 27, 1909, through its legislative department, enacted, and on March 6, 1909, the mayor approved, an ordinance which was as follows:

"Be it ordained by the general council of the city of Louisville:

"Section 1. That no company, corporation or individual operating, conducting, maintaining a telephone system, or furnishing telephone service in the city of Louisville, shall charge more for service than the following rates which are hereby fixed, established and ordained to be the maximum rates that may be charged for telephone service in the city of Louisville.

"Sec. 2. For each telephone in a business house or office the maximum rate or charge shall not exceed, for a single or private line, unlimited service, $5.50 per month, or at the rate of $66.00 per year. For a party line, unlimited service, $4.00 per month, or at the rate of $48.00 per year. For each telephone in a residence the maximum rate or charge shall not exceed, for a single or private line, unlimited service, $3.00 per month, or at the rate of $36.00 per year. For a party line, unlimited service, $2.00 per month, or at the rate of $24.00 per year. For each extension desk telephone the maximum rate or charge shall not exceed $1.00 per month, or at the rate of $12.00 per year.

"Sec. 3. Any person, firm or corporation violating any provision of this ordinance or charging a higher rate for telephone service than is fixed by this ordinance shall be subject to a fine of not less than $5.00 nor more than $25.00 for each offense. Each charge for telephone service in excess of the rates herein fixed and each month that such charge is made for such service shall constitute a separate offense."

Of course the city was not bound by any law or constitutional provision to make any inquiry before enacting the ordinance, but when it is known that it did not do so in respect to a matter as important and intricate as the one involved, the weight of any presumption in favor of its action is lessened. However plausible it may appear on paper, guess work, if ever admissible upon so difficult a problem as rates, is likely to lead to unsatisfactory results and possibly palpable injustice. As the rates thus fixed effected a very material reduction, the company, on March 8, 1909, filed its bill, in which it prayed that the city be enjoined from enforcing the ordinance. The ground upon which that relief was sought, speaking generally, was that the rates fixed by the ordinance were confiscatory, and would not, if enforced, permit the company to earn a fair, reasonable and just income and return upon the value of its property in the city used for operating and conducting its business. In April, 1909, the case was referred to a special master, with instructions to take the testimony and report to the court his conclusions upon various questions set forth in the

order of reference, the details of which need not be stated. The order of reference was, of course, designed to afford the means for ascertaining all the facts necessary to enable the court to meet the requirements of the rules laid down by the Supreme Court, notably in Knoxville v. Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371, and Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382.

[1] Great labor was thus devolved upon the master in the effort to ascertain the facts bearing upon the case from many points of view, and the mass of testimony has made up a most voluminous record, the study of which has imposed upon the court also a great task. After many months devoted to the work, the master filed a report stating his conclusions of fact and of law. Many exceptions thereto have been filed by the parties, and the questions raised have been the subject of very interesting and instructive argument. Where a master makes findings of fact it is the usual practice of courts of equity to treat those findings as, prima facie, correct, and not to disturb them, unless he has proceeded upon an erroneous theory of the law applicable to the case or has made findings of fact which are clearly against the weight of the testimony. Much less weight, however, is given to this prima facie presumption in cases where the powers of a legislative body are called in question, or where constitutional rights are involved. Such delicate and important questions demand the more direct attention and labor of the court itself. 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371.

[2] In many cases the Supreme Court has stated the general rules applicable to the essential propositions which must lie at the bottom of the claim to relief against the ordinance in question. It seems to be settled that while rates which, under the circumstances, are unreasonably high may not be charged by a public utility corporation to enable it to earn dividends which otherwise it could not earn, yet such corporation should be permitted to charge rates which are, under all the circumstances, reasonable and just, and which afford a fair return upon the value of its property. The legislative department of a state or city may compel the corporation to charge rates which are reasonable and just, but may not fix rates which are so low as to deprive it of a fair return upon the value of its property which at the time is being used for the public in the operations of the company within the jurisdiction of the legislative body which attempts to fix rates. Were this not so, property of the company would be used not for the benefit of its owners but for that of the public, in which case the property would be appropriated by the public without just compensation, and would be a violation of constitutional rights.

In Knoxville v. Water Co., 212 U. S. at page 17, 29 Sup. Ct. at page 153 (53 L. Ed. 371), it was said: "It cannot be doubted that in a clear case of confiscation it is the right and duty of the court to annul the law. Thus in Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362 [14 Sup. Ct. 1047, 38 L. Ed. 1014], where the property was worth more than its capitalization, and upon the admitted facts the rates prescribed would not pay one-half the interest on the bonded debt;

in Covington, etc., Turnpike Co. v. Sandford, 164 U. S. 578 [17 Sup. Ct. 198, 41 L. Ed. 560], where the rates prescribed would not even pay operating expenses; in Smyth v. Ames, 169 U. S. 466 [18 Sup. Ct. 418, 42 L. Ed. 819], where the rates prescribed left substantially nothing over operating expenses and cost of service * * * injunctions were severally sustained." But on page 16, 212 U. S., on page 153, 29 Sup. Ct. (53 L. Ed. 371) of the report of the same case the court had said: "If a company of this kind chooses to decline to observe an ordinance of this nature and prefers rather to go into court with the claim that the ordinance is unconstitutional, it must be prepared to show to the satisfaction of the court that the ordinance would necessarily be so confiscatory in its effect as to violate the Constitution of the United States."

[3] It would seem clear from the decisions that the most material question in such cases is that of the reasonable value of the property "at the time it is being used for the public"—that is to say, the time at which the question arises—it being upon the reasonable valuation at that time that the company is entitled to earn a fair return. Willcox v. Consolidated Gas Co., 212 U. S. 41, 29 Sup. Ct. 192, 53 L. Ed. 382. The ascertainment of the present value of the company's plant is therefore a matter of prime importance, and the subject, speaking generally, may be viewed from many standpoints, as to which it may suffice for present purposes to suggest that if the expenditures in the construction and equipment of a public utility corporation have been absurdly extravagant and wasteful it would not be admissible to say that such outlays fairly indicated the real value of its plant nor in such a state of case that rates should be fixed upon a scale that would pay ordinary dividends upon a licentiously extravagant cost of property, and similar considerations might apply if fictitious values were the result of "watering" the stock. On the other hand, if property had been obtained at a price far below its real value in better hands, or if some one of the many accidents or unsuspected reasons for a large increase should fortunately operate to double the value of a plant it would not be just nor reasonable to confine ourselves to the lower or former value not to say that such former value continued to be the real one. The value of a plant may depend upon good fortune, upon good management or upon fortuitous circumstances, but in every event the reasonable value of the property "at the time it is used for the public" is the value we are to ascertain for the purposes of this controversy. Cost of the plant at a much earlier date may throw some light on the question of value, and hence the provision in the order of reference directing the inquiry as to the cost. Of course as this direction was made in advance of knowledge of the actual situation it could not be then seen that the question as to the cost of the plant would be so complicated as the inquiry developed it to be. The wisdom of the rule which fixed present value instead of the original cost of the property as the prime factor in our problem is well illustrated by this case, although here, as in all similar cases, the question of value must largely be a matter of opinion. Not because the cost of the plant was at all conclusive in its bearing upon

the questions involved, but, as already stated, because it might be helpful, the court, in the order of reference, directed an inquiry into the actual cost of the company's property in this city. The lapse of many years, the multitude of items making up the total, the wide diversity of present views as to what expenditures should have been or should now be included in the cost of construction, etc., the manner of keeping the company's accounts (though no dishonesty is attributable, inasmuch as no motive is conceivable which at that time tempted to deliberate wrong), and other considerations have so obscured the question of cost of the plant as to greatly weaken the value of this inquiry, laborious and painstaking as it appears to have been With all these difficulties to contend with, the master has found that the total cost of the company's plant and property in this city, includ·ing toll lines but excluding real estate, was $1,506,531.21, while the company insists that it was $1,864,583.10—a difference of $358,-051.89. This large difference does not seem to grow, to any material extent, except as to the value of real estate and toll lines, out of anything except a difference of opinion as to whether certain expenditures, which no doubt were actually made, should be charged to construction or some other account. In his estimate of the cost of the company's plant the master excluded certain items which the company insists should have been included. The city made no objections to the finding of the master as to cost of plant, but the contention of the company may probably be best stated by an extract from its exceptions to the master's report. After claiming that it had been agreed between counsel representing both sides and approved by the master that whatever the two accountants representing the two sides respectively should agree upon as the cost of the plant should be accepted by all parties as correct, and no testimony permitted to vary or contradict it, the company, in its exceptions, says:

These accountants, having agreed upon the records of complainant, showing the cost of the Louisville plant, excluding toll lines and real estate, should, under the agreement, be accepted, and the cost was, as stated...................... $1,702,391 68

### Summary.

Complainant, for the foregoing reasons, insists that the master was in error in reporting the cost to complainant of its plant and property in the city of Louisville, as of January 1, 1900, as only..................................................    457,759 07
And on December 31, 1908...................................  1,381,124 41
And real estate of only......................................    108,034 50
The master should have found and reported that complainant's plant cost it, as of January 1, 1900............................    678,354 69
And added construction to January 1, 1909....................  1,023,545 34

Making the total cost to complainant of its plant in Louisville, Ky., as of January 1, 1909................. $1,701,900 03
And construction added from January 1, 1909, to March 9, ·1909 ........................................................    491 65

Making the total cost of plant to March 9, 1909......... $1,702,391 68
And the total cost of real estate.............................    162,191 42

Total "cost of plant and property," March 9, 1909....... $1,864,583 10

The difference between the $1,702,391.68, alleged to have been agreed upon by the accountants, and the $1,506,531.21, fixed by the master as cost of the plant, plus $162,191.42, the value of the real estate, is the sum above referred to of $358,051.89.

Consideration of these contentions between the parties in connection with the master's findings, the exceptions thereto, and the large mass of testimony directed to the subject of cost of plant, will demonstrate the extreme difficulty of reaching a satisfactory conclusion upon the subject upon any very reliable theory, and the fact becomes apparent that its cost, under the complications presented in the record, would furnish a fallacious test of the actual present value of the company's plant and property in this city where it is being used for the public. We incline to think that these considerations may properly relieve us of the necessity of passing directly upon the exceptions to the findings as to the "cost" of the plant, although the master seems, in his estimate of the present value, to have proceeded upon a different theory, for he says, "If I am correct as to the original cost, then it is not possible that the value of the plant at this date is in excess of the cost." We are not sure that that result would necessarily follow, even if there were agreement upon what constituted original cost, but under the circumstances we think we need not pass on those exceptions, inasmuch as whether they are sustained or overruled the findings of the master as to the original cost, whether correct or not, under the circumstances of this case, furnish no very valuable guide for ascertaining the "present value" of the plant. It might happen that original cost and present value in a given case (especially if the plant were not old) would be approximately the same, but that would be a coincidence merely and not a necessary sequence. We think, therefore, that we may safely proceed to the consideration of the latter question without directly passing upon the exceptions to the master's findings as to the former, though we incline to think that the testimony clearly shows that the original cost of the company's plant, exclusive of real estate and franchise, was as much as $1,600,000 beyond any premium paid for stock in the Ohio Valley Telephone Company. In short, a determination of the question of original cost in this case would most likely be the determination of an abstract question, inasmuch as we feel compelled to hold that the original cost of the plant cannot, per se, be determinative of its present value. We shall, however, endeavor to give proper weight to the testimony as to original cost in our effort to ascertain present values. It may be proper to say, however, that in considering the testimony as to the original cost of the plant, so far as it bears upon present value, we have not overlooked the fact that each of the parties tendered to the master the services of an expert accountant, George Wilkinson being named by the company, and E. W. Farnham being named by the city; that they examined the company's books, and that they made a joint report to the master so far as they could agree, and separate reports upon points about which they differed. The master availed himself of these reports, and they were read as testimony at the trial. Wilkinson, as a witness, testified very fully in support of his report. Farn-

ham did not testify at all.   Whether the failure to call him was because of subsequent developments we do not know, but it was shown by the testimony that though he was the general manager of the Mutual Audit Company of this city, in his previous business career he had not been a bookkeeper, but had been a locomotive engineer, a telegraph operator, a train dispatcher, a constructor of works, an electrician and a detective, and besides had been engaged in the express business.   While this may account for his not being called as a witness by the city and subjected to cross-examination, it hardly adds weight to his report to the master, which, however, may have been to some extent at least the work of his assistant, H. B. Warren, who is a bookkeeper, and who did testify.

### Present Value of the Plant.

In the order of reference the master was directed to find the value of the plant on March 6, 1909, when the suit was brought, and on November 17, 1910, when his report was filed.   It will be seen that about 20 months elapsed between the earlier period and the last.   Under what he conceived to be the proper rules for his guidance in ascertaining the original cost of the company's plant the master, as we have seen, found it to have been $1,506,531.21, including the cost of the toll lines but excluding the cost of the real estate.   In his report the master says:

"The service rendered by complainant is good, and the physical condition of its plant is excellent."

He also says:

"For all practical purposes the Louisville exchange in all its parts performs well the functions of a new plant, and is nearly equal physically to a new plant."

But, as we have seen, he also says:

"If I am correct as to the original cost, then it is not possible that the value of the plant at this date is in excess of the cost."

He also says:

"I see no reason to doubt that the value of the plant as of the first of November, 1910. is not of much less value than I have found it to be as of date March 6, 1909."

In other words, for the 20 months ending in November last there was little or no actual depreciation in its value.

The master had not seen his way properly to include in his estimate of the cost large sums which the company insisted should be included therein, but while he fixed the cost of the plant at the sum named, to wit, $1,506,531.21, he fixed the present value at only $1,355,875.09, including, as we have seen, the value of its toll lines.   He fixed this valuation after, for some unexplained reason, deducting a flat depreciation of 10 per cent. alike upon the plant and upon the toll lines, thus finding the plant to be at present worth less by $150,653.12 than his own estimate of its cost.   It would seem to result from this that the master was of opinion that the corpus of the plant, notwithstand-

ing the expenditure of large sums for repairs and maintenance and indeed for reconstruction, had not been kept up during the period ending March 6, 1909, to the standard which he found to exist now, although there was strong testimony to the contrary. The finding of the master as to the present value of the plant is the subject of many exceptions by both parties, and before we proceed to the consideration of the question upon the testimony of the witnesses (which at least appears to be the best way to get at it) we may notice those exceptions of the complainant which call in question the accuracy of his conclusions in excluding several items from his estimate. Those items were: First, what are called "overhead charges," which are made up of various items of expenses incurred in the organization of the company and its work, the details of which need not be stated, but which it is claimed could not be avoided, and which enter, as is insisted, into the present value of the plant. These charges amounted to $90,000. Second. Expenses of securing business, and particularly the value of the franchise, right of way office furniture, etc. The value of the franchise, it is claimed, is $80,000. Third. "Working capital" amounting to $33,353.15, and supplies on hand amounting to $18,000. Fourth. The real estate and the improvements thereon of the value of $162,191.42. Fifth. The amount, somewhat indefinitely stated, of the excess in value of the toll lines over the $112,866.12 fixed upon them by the special master. Sixth. It is insisted that $50,000 should have been included in the estimate as a distinct and additional enhancement of the value of the plant because of the fact that the company is a going concern. In valuing property of the character of that involved here it would indeed be looking only at "its bare bones" not to take into consideration the fact that the company is a going concern. That fact, however, though possibly somewhat unconsciously to themselves, must necessarily, we think, have been taken into account by the witnesses who testified as to values. Property underground or overhead, thinly strung out over many miles, would have very diminished value were it not. in actual use for the purpose for which it was installed. The matter does not appear to have been passed upon in the report, nor, while it is argued in the brief, does any exception appear to be based upon this phase of the case, but we have concluded that this element of value would hardly be susceptible of accurate measurement by· and of itself, and we shall consider the fact to be that it was an inherent factor in the estimate made by each witness who testified as to values.

[4] It seems to us that a proper amount of working capital should have been included in any estimate of the present value of the plant. In normal cases (and we may assume this to be such) it would play a very important part in enterprises like a telephone company. No association of prudent business men probably would attempt to conduct a large business, such as that involved in this case, without keeping a, considerable working capital on hand devoted to that business and which would really be embarked in it. It would seem to be quite essential to the successful operation of any great plant that some work-

ing capital should be kept on hand and available for immediate uses, and such capital would seem to be a very proper and important part of the property which, it may fairly be said, is "being used for the public." It may be difficult, however, to say in this case, as in all others, precisely what the amount of such working capital should be.

Very similar considerations apply to what are called "supplies on hand." We think prudent management demands that a reasonable quantity of articles certain to be called for in the operation of the plant should be kept on hand, and, if on hand, should be included in any estimate of the present value of the property which is "being used for the public."

The "franchise" and "rights of way," in cases like this, would seem to be absolutely necessary for the company, and being so, they are valuable, and under some circumstances should be included in any estimate of the real value of property used for the public. But while a franchise is a possession of great value to a telephone company in any city, it must be remembered that the franchise in this case was given freely and without price to one of the constituent companies of which complainant was made up. The gift was made before the adoption of the present Constitution of the state. As it was a free bestowment by the people, and could not figure as an item of expense in the original cost of the plant, and as no direct proof was tendered as to its present value (the only proof being that it was put into the consolidated company at, say, $100,000, and then afterward carried by the company on its books as an asset), we are disposed to ignore it as one of the values upon which a fair return may be earned by rates charged to the people who gave it. If it had been paid for originally, or even if any testimony had specifically shown its present value, we might have reached a different conclusion, but under the circumstances we are not disposed to guess about it.

We suppose the franchise includes the right of way over the streets and alleys of the city, but there are other rights of way that must come from the owners of private property. Instances of this may occur where lots are crossed by the company's lines, or where wires are strung over housetops. As to the value of these rights of way considered separately from the other property of the company there was no direct testimony, and we shall treat their value as a negligible quantity or one which has already gone into the estimate of the value of the plant.

Office furniture is a small matter, but would seem to be necessary to the efficient conduct of the company's business. Its value is shown to be $2,000, but it is not entirely clear that it was not included in the estimates of value made by the witnesses. Hence it will not be figured separately.

"Overhead charges" consist of expenses much of which were incurred long ago. Probably those expenses may have aided very materially in increasing the present value of the plant. That present value we must ascertain, but it does not follow that "overhead charges" as a separate item should be included as such. It seems to us that

they are too intangible to be available for that purpose. But we think that working capital and supplies on hand (which are practically equivalents) have tangible values which should have been taken into the estimate of the value of the plant. In their exclusion from the estimate we think the Special Master proceeded upon an erroneous theory, and we have concluded that their valuation should have been fixed as follows: The working capital at $33,000 and the supplies on hand at $18,000—a total of $51,000. We incline to think that the term "working capital" might embrace both items, as supplies on hand may fairly be regarded as part of the working capital in another form.

## Real Estate.

It remains to be considered whether the company's real estate should be included in estimating the present value of its property. The master excluded it from his estimate, but does not directly give his reason for so doing. A statement in a later part of his report seems to authorize the inference that he did it because the company charged up to expenses and credited to income an estimated rental for the real estate including taxes and interest. If this be his reason we think it was not maintainable. The value of the real estate should be included because it is part of the property which is being used by the company for the public. George Wilkinson, one of the expert accountants, is not contradicted in his testimony that the company carries on its general books an income account, to which is credited an estimated amount representing the rental value of its premises, which amount is charged to operating expenses, and which estimated rental value the company treats on its books of account as income. Assuming this to be true, we think it furnishes no reason for including this estimated rental either in income or in expense from any standpoint appropriate to this litigation, however appropriate as matter of mere bookkeeping it might be for it to appear in the accounts of the company. Because its real estate is part of the "property which is being used for the public" its value should be included in the estimate, but as no rent was actually paid for the real estate by the company, there was no actual outlay, nor was there any income derived from the real estate, as the company did not pay itself for the use of its own property. The bookkeeping of the company in this respect was based upon grounds other than actual earnings and expenses. If effect is given to this bookkeeping in this particular litigation the result would be to exclude the company from the benefit of the value of its real estate in estimating the reasonableness of the rates it should be permitted to charge. Nothing in fact is separately earned and collected from the real estate. Its use is to enable the other parts of the plant—such as business and residence telephones, toll lines, and the like, upon which actual cash is collected—to earn income. In the direct sense, therefore, the real estate brings in no separate income. Nevertheless it is a very essential part of the company's property which is being used for the public. We think the exclusion of the value of the real estate was erroneous, and we find that its value is and was at least $162,000.

## Separate Value of the Plant.

In considering the question of the value of the plant outside of various items already disposed of, we find it impossible, amidst the immense complications disclosed in the testimony, to go into details. Our task for the present is to ascertain whether the company has made it clear that the master's valuation of the property which is being used for the public is too low, and, if so, to what extent. The Supreme Court said in the case last referred to that any estimate of value must be an opinion estimate. In a case like this there is no possibility of scientific accuracy. The master seems to have based his final estimate of the value of the plant largely upon his conclusion as to its original cost, less certain depreciations, and then he makes a flat deduction therefrom of 10 per cent. in addition. As already intimated, we have concluded that original cost does not of itself furnish a reliable test of actual values in a case like this. Discarding it, as we do, devolves upon us the task of ascertaining the value of the plant upon all the testimony heard in the case. This may be a different, but it is by no means a less difficult or less laborious task. Nor is it the less necessary because the results of the two processes may not be strikingly variant. Details would extend this opinion to unbearable length, and we shall be content with saying that a very careful and protracted consideration of all the testimony has led us to the conclusion that the master's estimate of the reasonable value of the plant is clearly too low. He says:

Convinced as I am that my finding as to the cost of the plant is
correct, I am, for the reasons stated. persuaded that the value
of the plant as of March 6th, 1909, all features of depreciation
considered, ought to be and is..............................$1,381,124 41
Less depreciation of 10 per cent...........................   138,112 44

Leaves .................................................$1,243,011 97

This does not embrace real estate nor toll lines nor working capital, if any should be allowed.

The value of the plant, after considering depreciation, I find to
be ........................................................$1,243,011 97
Value of toll lines and equipment.........................   125,406 80
Less depreciation of ten per cent.........................    12,540 68

Net value.............................................$ 112,866 12
I find therefore that the total value of the exchange, including
the toll lines, but excluding real estate, as of March 6, 1909...$1,355,878 09

We have not been able, from anything said by the master, to see what his reasons were for the reduction of 10 per cent. for depreciation, as shown in the above extract from his report, particularly as the large sums shown by him to have been expended for maintenance and reconstruction had, as he tells us, put the plant in excellent condition and practically equal to a new one, and had prevented any material change of its value during the 20 months the case was before him. If we eliminate the 10 per cent. reduction made by the master we find that his estimate of the value of the plant would be $1,506,-665.09, which would be $133.88 in excess of the original cost of the

plant, which he found to have been $1.506,531.21. We think the reduction of 10 per cent., under the circumstances, was in large measure an arbitrary reduction in the sense that it was without an adequate basis in view of the large expenditures made to keep the plant up to the standard.

As opposed to the master's valuation of the plant at $1,355,878.09, including toll lines, but excluding real estate, the company, as we have seen, insists that the plant is worth $1,702,391.68, exclusive both of toll lines and real estate. This contention of the latter seems to be based upon the assertion that the two accountants who jointly examined the company's books have agreed that the books show that the plant alone had cost that sum. It may be remarked that the accountants agreed that the books did show the latter sum to be the original cost of the plant, but they differed upon the question of whether some of the items should have been embraced therein. We have already stated our reasons for concluding that whatever the company's books may show, after the plant has existed for so many years, the original cost is not, per se, a reliable test of its present value. Other reasons might be added, such as failure to do adequate work by costly patented articles which would be thrown away. No exceptions have been taken by the city to the action of the master in including the toll lines in his valuation of the plant. All agree that the toll lines should have been included. While we think the master's valuation is too low, we also think that the company insists upon a valuation that is too high. Many witnesses testified as to the present value of the plant exclusive of the real estate, and several of them had also testified as to its original cost. They differed very widely in their estimates. One of them, out of the seven who testified, fixed its value at over $1,770,000, another at over $1,700,000, two at something over $1,600,000, two at about $1,000,000, and one at $875,000; and if it were not altogether obvious that some of the witnesses testified after adequate opportunity to know the facts, and that some of them testified without such opportunities, we might average their estimates. But we cannot take refuge in any law of averages in this case without being sensible of the manifest injustice of placing the testimony of the two classes of witnesses upon an equal footing. So that, allowing for the bias of the witnesses, the one way and the other, arising from employment, from partisanship, and from the eagerness of strife, we have reached the very deliberate conclusion that the value of the plant itself, including toll lines, but excluding the things presently to be mentioned—

Is and was when this suit was brought at least....................$1,575,000
That the real estate is worth.....................................162,000
That the supplies on hand are worth...............................18,000
And that the working capital should be placed at..................33,000

Making the total value of the company's property now being used by the public............................................................$1,788,000

## Net Earnings.

The master, as directed, went into the question of net earnings for the four years immediately preceding that in which the ordinance

complained of was enacted, namely, the years 1905, 1906, 1907, and 1908. We shall not attempt to ascertain the net annual earnings of the company in this city by striking an average for the four years, but will assume that the year 1908 (in which the gross earnings were greater and the gross expenditures less than in either of the four) is that upon which the city probably had the best right to rely as a basis for what it did. In 1908 the gross earnings, as shown by the master, were the sum of $325,838.30, exclusive of the item presently to be noticed. In this sum is included $7,632.11, which represents 15 per cent. of all the tolls collected by the company upon all long-distance messages sent from this city over the company's long-distance wires. The other 85 per cent. of such collections were not taken into its accounts by the company as part of its earnings in this city. The proof renders it entirely clear that the company uniformly contracts with numerous other companies, in many of which it has no interest, to handle all the toll business between them, so far as it goes over its lines, for a compensation fixed upon a basis of 15 per cent. of tolls on outgoing messages only, and we are free to say upon the testimony that this appears to afford a fair compensation for the service it renders both upon outgoing and upon incoming messages, and if this is so in respect to outside companies we know of no very good reason why the same rule may not be applied here, because very much the larger part of the company's own toll service is over wires and through instrumentalities located entirely outside of Louisville, that city furnishing the facilities of a terminal point only. The company's property here contributes only a small item in the mass of the property the company actually uses in long-distance service over its own lines. These are matters of importance to be remembered in connection with our duty to ascertain what is a fair income upon that part of the company's property which is located at this point. The master concluded, however, that the 15 per cent. was not a fair division, and that the other 85 per cent., which amounted in 1908 to $43,248.70, should also be included in the gross earnings of the company here, which, of course, would require it to put into any estimate of its earnings upon the property it has in Louisville, a great sum which its local property did not in fact earn, but which was earned by other property located all over the South. The result of the master's conclusion upon this item was to swell the gross earnings of the company at this point from $325,838.30 to $369,087.00. We think that neither the testimony nor sound reason will justify all of this addition, but while we are extremely doubtful of its correctness we have concluded, under the peculiar circumstances of this case, to add to the 15 per cent. already included in the gross earnings the further sum of $5,088.08 to cover the cost of operating here the toll lines extending elsewhere, thus allowing for the local work 25 instead of 15 per cent. The last-named sum, added to the $325,838.30, will make the gross earnings for 1908 $330,926.38, instead of $369,087.00, as found by the master.

In respect to the so-called rentals of the company's local real estate, we have concluded, for the reasons already indicated, that as they were included alike in the estimate of gross earnings and gross ex-

penses they will offset and balance one another. Strict accuracy, of course, would require different treatment, but as allowing them to offset each other will accomplish practically the same result as taking them out, we shall let them stand, as any difference in result will be quite immaterial.

The master finds that the total operating expenses of the company for 1908, though greatly less than those for the three preceding years, were $216,363.07. In this is included $86,155.98, the amount which he finds was actually expended by the company for what he calls "maintenance and reconstruction." He found the average amount spent for that purpose for the four years to be $94,490.19. The company did not therefore spend in 1908 the average amount by $8,334.21. Depreciation, calculated on the basis of 7 per cent. on the master's valuation of the plant, viz., $1,355,878.09, would call for $94,911.46 per year, which is $8,755.48 in excess of the amount actually expended on that account in 1908. The master finds that the net income of the company in 1908 was $150,673.19, but when we deduct from the gross earnings as we find them, viz., $330,926.38, the full amount of $216,-363.07, found by the master to be the gross expenses, we find the apparent net income to be only $114,563.07, which would be $6^7/_{17}$ per cent. upon $1,788,000, which we find to be the value of the company's property. Can we accept the $114,563.31 as fairly representing the company's net earnings in 1908, the year always most favorable to the city and upon which therefore we have based all our calculations? We conceive the answer to this question to depend upon the valuation of the plant, and upon how we treat the matter of depreciation. While we shall soon come to the latter, we may so far anticipate it as to say that if we shall find 7 per cent. on the present value of the company's destructible property (which we have fixed at $1,575,000) to be the proper provision for depreciation, the difference between that sum, viz., $110,250.00, and the $86,155.98 which was actually spent for depreciation in 1908 will be $24,095.02, which would reduce the net earnings to $90,468.29, equal to $5^{10}/_{17}$ per cent. on the value of the company's entire property here. If we estimate the 7 per cent. on the original cost of the plant as it was found by the master, viz., $1,506,531.21, we find the difference between $105,457.19, the sum thus produced, and the $86,155.98 to be $19,301.20. This would reduce the net earnings to $96,262.11, which would be $5^6/_{17}$ per cent. on the value of the company's property. Of course the amount needed to restore the values lost by depreciation necessarily varies from year to year because some parts of the plant have shorter life than others, but we have reached a point where we must ascertain what proportion of the earnings should, for the future, be allowed for restoring values to be lost by the termination of the life of the plant.

### Depreciation.

[5] In other words, it has now become essential that we shall consider the question of depreciation. In Knoxville v. Water Co., 212 U. S. 13, 14, 29 Sup. Ct. 152 (53 L. Ed. 371), the court said:

"Before coming to the question of profit at all the company is entitled to earn a sufficient sum annually to provide not only for current repairs but for

making good the depreciation and replacing the parts of the property when they come to the end of their life. The company is not bound to see its property gradually waste, without making provision out of earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that at the end of any given term of years the original investment remains as it was at the beginning. It is not only the right of the company to make such a provision, but it is the duty to its bond and stockholders, and, in the case of a public service corporation at least, its plain duty to the public. If a different course were pursued the only method of providing for replacement of property which has ceased to be useful would be the investment of new capital and the issue of new bonds or stocks. This course would lead to a constantly increasing variance between present value and bond and stock capitalization—a tendency which would inevitably lead to disaster either to the stockholders or to the public, or both. If, however, a company fails to keep the investment unimpaired, whether this is the result of unwarranted dividends upon over issues of securities, or of omission to exact proper prices for the output, the fault is its own."

[6] A very intelligent witness—George Wilkinson—in his deposition said:

"Depreciation may be defined as the loss in value of some destructible property over and above current repairs."

We accept this as a sufficiently accurate definition of that form of depreciation which now concerns us. What sum should, year by year, be set apart to resupply values lost in the current depreciation of what may be called the company's working plant is not always a matter of easy solution. The testimony upon the subject in this instance is somewhat conflicting, and the opinions of the witnesses do not altogether agree. The master expressed his own conclusions as follows:

"In view of the foregoing, I find that the fair and reasonable amount or proportion of annual income of complainant that should be set aside as a substantial provision and allowance for depreciation of complainant's plant and property employed in its business in Louisville, and including everything except cash working capital and supplies, would be an amount equal to 7 per cent. of the value of the plant, as above limited, and that the amount expended annually for maintenance and reconstruction of the plant should be deducted from the 7 per cent. fund."

It is obvious that the last clause of what he says makes it difficult to understand his findings, and especially difficult to reduce it to a percentage which will apply to the future. These difficulties, however, are somewhat moderated when we find that the master himself appears to have figured depreciation upon the basis of about 7 per cent. of his valuation of the property, and we shall go upon the idea that he meant to find that 7 per cent. was proper. If any of the exceptions reach this finding, the question to be considered is, What proportion of the company's annual earnings shall, in the language of the Supreme Court, which we have just quoted, be set aside "for making good the depreciation and replacing the parts of the property when they come to the end of their life?" This provision is altogether apart from and beyond current repairs. 212 U. S. 12, 29 Sup. Ct. 152 [53 L. Ed. 371]. It is apparent from the record that persons in the telephone business use the words "reconstruction" and "depreciation" almost if not quite interchangeably, so far as money spent or to be

spent is concerned. In their art the two things are substantially the same from that standpoint. This being so, we avail ourself of the labor of Prof. D. C. Jackson, whose very intelligent report to the Massachusetts Highway Commission was read as testimony. He says:

"The appraisal affords information on which your honorable body can decide how much money the company should be allowed as return on its investment, and how much it should be reasonably expected to expend on the average per year for reconstruction for the purpose of maintaining the plant, against the ravages of age or the obsolescence incident to inventions and other causes for improvements and changes in the art. Whether the return on investment is ultimately to be figured on the outstanding stocks and bonds of the company or on the value of the plant, the sum that must be allowed for reconstruction is unquestionably determined by the actual existing values of the different kinds of property composing the plant, which values are shown by the appraisal.

"This reconstruction is called for on account of several factors. The rotting of poles so that they must be replaced, the deterioration of conduits, cables and wires so that they must be replaced, and the other effects of the elements and of use on every part of the plant ultimately bring nearly all parts of the telephone plant to a point where their further use is impracticable without rebuilding, however well cared for and carefully kept up by current repairs they may be. The part of the plant affected must then be bodily replaced. The advances occurring through improvements in the art also make an important factor in the telephone business which demands the remodeling or the bodily replacing of parts of the plant from time to time before their natural life is run. A third factor is introduced by the action of municipal and other boards who may order improvements of streets and roads, as by ordering good pole lines removed to alleys or wires placed underground. None of these factors can be cared for out of a uniform appropriation such as may cover ordinary repairs; and the cost of making good after special attacks of the elements, such as damage of pole lines from sleet storms, the effects of forest fires, etc., is still more capricious in its occurrence. Nevertheless, these expenditures must be made out of current receipts year by year or the capital of the company is bound to become impaired. For this purpose, the average rate of reconstruction likely to be required over an extended period of years must be figured on the basis of experience, and a corresponding sum of money should be set aside each year to be expended in reconstruction or operating plant as the conditions require it. Less than this amount may be used in some years and more in other years, but the amount to be taken from the gross receipts each year for this purpose should be fixed upon an average determined by the extent and value of each kind of plant in the complete system. As a result of our study of the complete plant, we have applied percentages to each kind of construction involved. giving consideration to first cost, rate of depreciation, probable effects of rate of changes in the art and the acts of municipal bodies, special misfortunes caused by the elements, and also giving consideration to any salvage that might be recovered from discarded plant. The consideration of these various factors is based on experience in telephony and electric lighting of the past and as much judgment of the future as may be brought to bear. In this way we arrive at a figure for the average yearly reconstruction account for the property used in Massachusetts business, which is equal to 7.3 per cent. of the value of such property exclusive of land, general supplies, and working capital (net current assets and cash on hand)."

As the conclusion of the master is not clearly stated in simple form, but is somewhat complicated by the qualification of his finding introduced in its last clause, we have concluded to reconcile any differences of opinion developed by the testimony by finding, as we now do, that a reasonable amount to be set apart in this climate for making good

depreciations is 7 per cent. of the value of the company's plant, exclusive of real estate, working capital, and supplies on hand. We think the testimony clearly leads to the conclusion that the average life of the combined elements which make up the plant is about 14 years, and we shall act upon that theory. The real estate and the working capital of the company are not subject to such depreciation as that now in question. In estimating depreciation we shall, therefore, reckon it at 7 per cent. on $1,575,000, which we have found to be the value of the destructible parts of the plant. In reaching this conclusion we have borne in mind that the past is fixed. We cannot change it. But taking the company's plant as it now is and as it probably will become in the future, and remembering that the value of its real estate and working capital will almost certainly not depreciate at all, the problem has been to ascertain what per centum of the earnings of the company will be required to keep what is called its plant always in as good condition as it is now or as it may become. Of course our estimate could not be based upon the proposition that the per centum set apart to cover depreciation would be deposited in bank or loaned out from year to year so as to accumulate and be on hand at the end of 14 years, and to be then used to construct an entirely new plant, and so on from period to period. In such a case the public would not only have a service that would progressively grow worse until its operations ceased altogether, but it would thereafter get no service at all until a new plant replacing the old could be completed and put into operation. The question rather has been, What does experience show to be the proper average per cent. of annual earnings which the company should expend in order to insure that its plant at the end of 14 years will be as good as it now is, and in the meantime render to the public that good service which its duty to the public requires. The master, after finding that the cost of the plant was $1,506,531.21, finds that its present value is only $1,355,878.09. If this is correct it necessarily indicates that in the past enough money has not, from time to time, been expended upon reconstruction and reinstatement to make good the depreciation and keep the ever-failing parts of the plant up to the standard by resupplying all values that have been destroyed. And if this is true, the company's inadequate expenditures in the past do not, per se, furnish a safe guide for the ascertainment of what should, in the future, be set aside for depreciations. But we think the 10 per cent. reduction is not sustainable and that it is not consistent with other findings of the master, and that if it could have been justified at all it must have been either upon the ground that 7 per cent. had not been expended for keeping the plant in good condition or upon the ground that 7 per cent. was not sufficient, even if spent, to supply the depreciation. Indeed, if the 10 per cent. reduction were proper, it might well be that 8 per cent. should annually be set aside for depreciation. In our view, however, 7 per cent. of the value of the plant is the proper per cent. to allow for depreciation.

It may not be out of place in this connection to observe that in private business where the owner may fix his own prices for the use

of his property his own interest may compel him to keep the property he hires to others up to a standard that will induce them to use it, but no one can directly compel him to do so. It is different with public utilities corporations. The owners in such cases have not the absolute and uncontrolled right to fix their own prices for the use by the public of the utilities they furnish. Instead, prices may, within certain limits, be regulated by public authority, but when that authority attempts to regulate the rates to be charged for the use of the property of another it must take into consideration and allow what would be a fair amount of the earnings of the property to be devoted to keeping it always up to the proper standard. What interest may force the private owner to do in respect to his own property the law compels public authority to do when the latter undertakes to fix rates to be charged by public utilities corporations.

## What is a Fair Return?

Where persons have put their money into property which is used for the public they are entitled, year by year, to earn upon the property so employed a fair return. This is not only an established judicial doctrine, but it is inherently just and right. The case of Willcox v. Consolidated Gas Co., 212 U. S., 29 Sup.. Ct., 53 L. Ed., to which, as well as to the Knoxville Case, we have so frequently resorted for guidance, sheds a clear light in this connection as well as in others. On pages 49, 50, 212 U. S., on page 198, 29 Sup. Ct. (53 L. Ed. 382); of the report, the Supreme Court said:

"In an investment in a gas company, such as complainant's, the risk is reduced almost to a minimum. It is a corporation, which in fact, as the court below remarks, monopolizes the gas service of the largest city in America, and is secure against competition under the circumstances in which it is placed, because it is a proposition almost unthinkable that the city of New York would, for purposes of making competition, permit the streets of the city to be again torn up in order to allow the mains of another company to be laid all through them to supply gas which the present company can adequately supply. And, so far as it is given us to look into the future, it seems as certain, as anything of such a nature can be, that the demand for gas will increase, and, at the reduced price, increase to a considerable extent. And interest in such a business is as near a safe and secure investment as can be imagined with regard to any private manufacturing business, although it is recognized at the same time that there is a possible element of risk, even in such a business. The court below regarded it as the most favorably situated gas business in America, and added that all gas business is inherently subject to many vicissitudes of manufacturing. Under the circumstances, the court held that a rate which would permit a return of six per cent. would be enough to avoid the charge of confiscation, and for the reason that such an amount was the return ordinarily sought and obtained on investments of that degree of safety in the city of New York.

"Taking all facts into consideration, we concur with the court below on this question, and think complainant is entitled to six per cent. on the fair value of its property devoted to the public use."

There the Consolidated Gas Company, under all the favorable conditions pointed out by the court, was held to be "entitled to 6 per cent. on the fair value of its property devoted to the public use." That company monopolized the gas service of the largest city in America,

and it appeared to the court to be unthinkable that the city, in order to make competition, would subject its population to the annoyances that would inevitably be involved in the effort. The income from investment in Consolidated Gas stock was regarded as permanent and certain, and the risk practically none. In such a case the owners of the property were held entitled to earn 6 per cent. on its fair value, and consequently it had the right to charge such rates as would enable them to do so. The case before us is vastly different. Here there is competition of a very dangerous character to the company. A rival company, thinking it could make money in doing so, got a franchise from the city upon condition that its rates for a long period should be as follows, namely: Four dollars per month for telephones in business houses, $2 per month for telephones in residences where the residence was one mile or less from the exchange, $2½ per month where the residence was over one and under two miles distant, and $3 per month if over three miles distant. Over $2,000,000 appear to have been expended on the plant of the latter company, and it has secured in this community a larger number of telephone patrons than has the complainant. Nevertheless it is notorious that dividends to its stockholders have been very meager for several years. Obviously this is a competition so disadvantageous as greatly to increase the risk of the owners of complainant's property in this city. For some cause or causes, however, and notwithstanding the much lower rates charged by the other company, about 10,000 telephones are operated by the complainant. The precise reason for this result we can only conjecture, though presumably its patrons find compensatory advantages. But all things considered, it is by no means extravagant to say that dissatisfaction with the higher rates of the complainant must be excited by the greatly lower rates charged by a rival company operating along the same streets, and dissatisfied people, looking only to what Byron calls that greatest of all human ills, the inflammation of their weekly bills, are not likely to consider whether or not the higher rates are in fact reasonable or such as are necessary to enable the complainant to earn a fair return upon its property used for the public. The contrast between the two rates no doubt is disagreeable, and this source of irritation might be aggravated by what we may call the bad manners of a utilities company in its dealings with the public. There are not wanting signs of such manners in this instance. The grossly profane outbreak of the president of the complainant while giving his deposition was as inexcusable as it was suggestive. But as any harm coming to the company from this kind of conduct must be borne by it alone, we only allude to it in order to express our condemnation of it. The lower rates of the rival company, though voluntarily consented to by it in advance in order to get a franchise, are productive of very little return to those whose money afforded the cheaper telephone facilities. While the difference in rates of the two companies must constantly be a source of irritation to many of those who pay the higher rates, this must not obscure our sense of the legal rights of the complainant. It cannot be doubted that growing out of

this situation comes one of the most serious risks of the complainant, namely, the danger of losing patrons. Its success as a business enterprise necessarily depends upon having public patronage from which to derive its revenue. Those of its patrons who become dissatisfied with its rates may, and many of them have, quit the company and have gone over to its rival, whose rates, while attractive to its patrons, are not very remunerative to itself. Nevertheless the complainant is entitled to be allowed, if it so chooses, to charge those who use its property for their own purposes such reasonable rates as will enable it to earn thereon a fair income whether or not a rival company can do so upon its property. In other words, the charging by a rival company of rates which it had agreed to as a condition precedent to being granted a franchise, while it adds to the risks of complainant's business, cannot affect the right of the latter to be allowed to charge rates which are not confiscatory, but which may yield a fair income upon the value of its property if that property is in fact used by the public.

The local situation here produces another risk, the serious nature of which may be indicated by this suit. That situation has already resulted in the municipal legislation now in contest, which, though easily and somewhat casually enacted without serious investigation, may cost the company at least 7 per cent., and probably more, of one year's gross earnings in contesting its validity—an expense which may fairly be held to be necessary and proper for the company to incur in self-defense. The conditions thus brought about inevitably greatly increase the risk of those who invest money in the telephone business in this city. Other circumstances might be noted, but what has been said will suffice for contrasting conditions here with those in New York in the case of the Consolidated Gas Company.

After much consideration of the subject and of the testimony heard thereon we have reached the conclusion that the complainant company is entitled to be allowed to earn, if it can, as much as 7 per cent. annually on the fair value of its property devoted to the public use in this city before its rates can fairly be reduced by legislative regulation. This per cent. is not to be calculated upon the company's stock, watered or unwatered, nor upon its bonded indebtedness, but upon the fair value of its property, inclusive of its real estate, its supplies on hand and its working capital. We are entirely satisfied that no prudent business man would willingly incur all the risks of the business and be content with being forced to earn less than that per centum of profit. And while many of us may not feel entirely willing to contribute to the earning of that much income, we should be much more unwilling to supply the capital for such an enterprise unless it might be allowed to earn, if it could, that much for us.

We are quite sure that a telephone company in respect to this phase of the case and under circumstances such as exist in Louisville cannot fairly be compared to our banking institutions when it comes to the consideration of the risk of the money invested. Indeed, no other business known to the court affords a very convincing basis of comparison, though that of the rival telephone company here might have

done so if its rates (self-assumed though they were) had not notoriously proved inadequate. Nor have we at all lost sight of the fact that the property of the complainant in Louisville is only a small proportion of the property it owns and operates throughout the country. Any dividends the complainant earns upon its stock is upon its operations as a whole, regardless of results in any particular locality. If it loses at one place it hopes to make up the deficiency elsewhere, but we conceive the law to be that it is entitled to earn, if it can upon fair and reasonable rates, a fair income upon its property situated in any given locality over which the power of the particular legislative body extends. Otherwise its property here might be subjected to confiscatory rates by our legislative bodies because its property elsewhere was earning better income. The force of this suggestion becomes apparent when we remember that if the rates charged by the company are too high in other localities they may, and probably will, be regulated and lowered by legislative authority there; that there is no practicable way for co-operation as to rates between legislative bodies in different states, and that very much the larger proportion of the earnings of the company are intrastate, and can only be regulated by those authorities which have jurisdiction in the locality where the earnings are realized.

### Rates.

The principles upon which we must proceed in respect to rates have been authoritatively established by the Supreme Court. Those principles are based upon that constitutional provision which forbids the taking of private property for public uses without just compensation. The interest of every individual citizen demands the rigid enforcement of this provision whether the legislation which denies it to be national, state or municipal, and its enforcement must not be denied because of prejudice nor at the behest of public clamor. In applying to this case the principles to which we have referred it should be borne in mind that in this instance we are not inquiring whether existing rates are too high. While we discuss existing rates for obvious reasons, our real task is to ascertain whether the rates fixed by the ordinance complained of are so unreasonably low as to prevent the earning by the company of a fair return upon the value of its property which is being used by the public. It goes without saying that the interest of the owners of the property leads to a desire for high rates and that of the consumer leads toward low rates. This sort of conflict is as old as time. In all such contests the court must ascertain what rates may yield a fair return regardless of the mere interest of either party to the controversy, and after a careful study alike of the testimony and the applicable law must find what is the logical and proper result. In this way we have ascertained the present reasonable value of the complainant's property here; the annual gross earnings and expenses of the company from the operation of that property in 1908, apparently its best recent year, the fair proportion of its earnings to be set aside in the future to cover and re-

supply the depreciation of the destructible parts of its plant, and the fair percentage upon the value of the company's property in this city which it should be permitted to earn as annual profits thereon by charging rates which are reasonable. All these things we have done, and have clearly ascertained that while an annual profit of 7 per cent. on the value of the company's property would be a fair return thereon, we have also ascertained that it does not, under present rates and after the allowance of 7 per cent. for depreciation on the portions of its property subject thereto, earn over $5^{10}/_{17}$ per cent. upon the value of that property. We also find that the rates fixed by the ordinance, if put in force, would result in an actual present loss of $49,721.76 in net annual earnings if the present status be maintained, but that assuming that the lower rates would bring an increase in the number of patrons and other advantages, and accepting the conclusion of the master that the net loss from the enforcement of the ordinance rates would be only $30,000 per annum up to 1912, we find, judging by the year 1908, and allowing 7 per cent. for depreciation, that the net profits of the company on the value of its property under the ordinance rates would be $60,468, or only $3^{6}/_{17}$ per cent. annually for the present. If the master should be mistaken in his forecasts as to earnings for 1909, 1910, and 1911, and if the $49,721.76 should continue to be lost in earnings for each of those years under the ordinance rates, then the company's property would only earn net $43,747.60, which would be $2^{7}/_{17}$ per cent. annually on its value. And these figures may be lowered to some extent by the new federal taxation and the costs and expenses of this action. Of course we are left to conjecture and guesswork as to what would in fact occur under the ordinance rates, and the court, at the final hearing, submitted in writing to the counsel for the respective parties a suggestion in this language:

"Does the record furnish the court with the means of estimating the earnings and expenses of the company for the years 1909 and 1910, and if not, would it not be well for a disinterested expert bookkeeper, not in the spirit of controversy, but with the view to ascertaining the figures, to make an examination of the books of the company in that connection and report the facts to the court?"

To this the complainant's counsel in open court agreed, but the defendant's counsel declined to do so, for the reason then stated by him that it would further delay the final decision of the case. In this situation it may aid us to remember that the average number of the company's telephones which were in use in this city during the four years immediately preceding the institution of this suit were as follows: 9,001 in 1905, 9,675 in 1906, 10,610 in 1907, and 10,212 in 1908. We have no data for the period during which this suit has been pending. If we take these figures as our guide we are not able to say that there is, under present conditions, any great probability of a notable change. To one acquainted with local conditions the decline in 1908 is as likely to indicate the course of events as was the increase in 1907, when the war on complainant was possibly less acute. We, therefore, cannot find in the figures just given anything like practical or reliable aid.

As to the future, everything is largely a matter of conjecture, but upon the testimony we are not well assured that conditions for the complainant will materially improve within the next few years. Its rival has, as we have seen, outstripped it in patronage. The causes leading to this will not only continue, but possibly may be intensified. If they materially improve in the future a carefully prepared ordinance can then adjust rates to the new conditions.

### Confiscatory Rates.

Of course if rates are fixed which will yield no income or profit to the owner the public will get the entire benefit of his property, and he will get none. Where rates are established which will yield the owner some income but below what is just and reasonable, the confiscation may be less pronounced, but nevertheless it will result to the full extent of the difference between the profits actually earned and those which would be just and reasonable. The first is unqualified confiscation. The latter is qualified and partial confiscation. Any legislation which certainly brings either result is confiscatory in character and consequently void as violating the Constitution of the United States. If, as we have found, 7 per cent. would be a just and reasonable income and profit for the complainant to earn upon its property, the ordinance complained of which would not permit the company to earn more than a possible $60/125$ of 7 per cent. is necessarily confiscatory in its nature and results, because it takes the difference of $65/125$ of 7 per cent. from the owner and gives it to the public without compensation. In other words, when the company, at its own rates and after setting aside a sufficient sum annually, in the language of the Supreme Court, for "making good the depreciation and replacing the parts of the property when they come to the end of their life," does not earn 7 per cent. but only $5^{10}/17$ per cent. on the fair value of its property used by the people, then, if notwithstanding that state of fact, the rates are lowered 30 per cent. by legislative action, such reduction under such circumstances is necessarily confiscatory to its full extent. And equally the confiscatory nature of the legislation will appear if we base our calculations on the net income under present rates in 1908. This we have ascertained to have been $114,563.07. In that year only the sum of $86,155.98 was actually expended to replace depreciations instead of the 7 per cent. on the value of the plant which we have concluded should be allowed for that purpose in the future. If from the $114,563.07 we deduct $30,000 (the estimated loss of income under the ordinance rates) we find that the net income would be only $84,563.07, an amount equal to only about $84/125$ of the 7 per cent. profit which the company would be entitled to earn annually—that is to say, the company, under the ordinance rates, would probably earn only $84,563.07 instead of the $125,120 it would be entitled to earn if it could. As the figures we have given show, either the $65/125$ or the $84/125$ of 7 per cent. would represent a confiscation of the earnings of the company under present conditions to the extent of not less than $30,000 per year even if the anticipations of the master

be realized. That is to say, assuming our conclusions to be correct (1) as to the proportion of toll line earnings to be taken into the estimate of earnings here; (2) as to the value of the destructible parts of the company's plant; (3) as to including real estate, working capital and supplies on hand in the valuation of the company's property used for the public; (4) as to the flat reduction of 10 per cent. for depreciation made by the master in his estimate of the value of the property; (5) as to the proper sum to be allowed in the future for depreciation; and (6) as to the net earnings for the illustrative year 1908, and finding that 7 per cent. upon our valuation of the property at $1,788,000 is $125,120—we have the basis of our computations. They do not show "a very narrow line of division between possible confiscation and proper regulation," again to use the language of the Supreme Court. On the contrary, it would be a very wide line of division. And it may be noted that, if only 6 per cent. were allowed for depreciation, the ultimate result would not be different as the ordinance rates would ill be confiscatory.

## What is the Remedy for the Present Situation?

We have now reached the point where we must consider whether we shall give an actual trial to the ordinance rates by putting them in force for a time, or whether we shall decree the relief prayed in the bill, and make perpetual the temporary injunction. We are not without guidance in this situation. In Willcox v. Consolidated Gas Co., 212 U. S. at page 42, 29 Sup. Ct. at page 196 (53 L. Ed. 382), the court, after remarking that the value of a plant was to a considerable extent matter of opinion, used this language:

"Of course, there may be cases where the rate is so low, upon any reasonable basis of valuation, that there can be no just doubt as to its confiscatory nature, and in that event there should be no hesitation in so deciding and in enjoining its enforcement without waiting for the damage which must inevitably accompany the operation of the business under the objectionable rate. But where the rate complained of shows in any event a very narrow line of division between possible confiscation and proper regulation, as based upon the value of the property found by the court below, and the division depends upon opinions as to value, which differ considerably among witnesses, and also upon the results in the future of operating under the rate objected to, so that the material fact of value is left in much doubt, a court of equity ought not to interfere by injunction before a fair trial has been made of continuing the business under that rate, and thus eliminating, as far as possible, the doubt arising from opinions as opposed to facts."

If we are correct in the conclusion that 7 per cent. annually on the value of the property used for the public indicates a fair income thereon for the complainant, and if we are correct in what we regard as the very conservative valuation we have placed on that property and in the amounts to be allowed for depreciation and upon the toll line earnings, unquestionably we should now enjoin enforcement of the ordinance without inflicting the inevitable loss upon the complainant that would come from a trial of the rates the ordinance fixes—a loss impossible to be recouped. We have ascertained that the company's rates do not themselves produce and most probably will not in the

near future yield the 7 per cent. If that be so, it follows inevitably that the ordinance rates, which are about 30 per cent. lower than the present rates, cannot possibly do so. Nor do we think it possible under existing circumstances, nor under circumstances which will probably arise in the future, that the line of division between possible confiscation and proper regulation will be a narrow one within the meaning of the Supreme Court. The most careful consideration of the testimony has led us to the clear conviction that the facts are as we have found them, and it follows that it is proper now to grant the injunction prayed for, and this view may be emphasized by the consideration already suggested that whenever there is an essential improvement or change in the situation which makes it admissible a new ordinance adjusted to the new conditions can then be enacted by the city.

## Exceptions to the Report.

The complainant filed a great number and variety of exceptions to the master's report. To give expression to them required 141 printed pages. What we have said requires that the exceptions should be sustained only to the extent that the views of the court as herein expressed differ from the conclusions of the master. All of complainant's other exceptions are overruled, except those relating to the master's findings as to the cost of the plant. They have been ignored for reasons already stated.

The defendant filed seven exceptions to the report. The first raises objections to the reading of certain depositions; the next four relate to certain minor items of expense included by the master in his estimate; and the others relate to the master's findings as to the effect of the ordinance rates. The court is of opinion that all of the seven exceptions should be overruled.

A decree may be submitted granting the injunction prayed for in the bill. The complainant is also entitled to recover its cost.