[Civil No. 3630. Filed January 27, 1936.]

[53 Pac. (2d) 1077.]

E. J. WOLFF and P. D. ETCHANDY, as Surviving
Partners of SAWYER–OTONDO SHEEP COM-
PANY, a Copartnership, and E. J. WOLFF and
P. D. ETCHANDY, as Individuals, Appellants,
v. THE FIRST NATIONAL BANK OF WINS-
LOW, ARIZONA, Appellee.

Messrs. Favour & Baker and Mr. A. M. Crawford, for Appellants.

Mr. J. P. Clark and Mr. W. E. Ferguson, for Appellee.

LOCKWOOD, C. J.—The First National Bank of Winslow, Arizona, a corporation, hereinafter called plaintiff, brought suit against E. J. Wolff and P. D. Etchandy, as surviving partners of Sawyer-Otondo Sheep Company, a copartnership, and E. J. Wolff and P. D. Etchandy, as individuals, hereinafter called defendants, on a certain written guaranty of the indebtedness of one C. W. Ross. The case was tried to a jury, which returned a verdict in favor of plaintiff, and from the judgment rendered on such verdict and the order overruling a motion for a new trial, this appeal was taken.

There are some sixteen assignments of error which are grouped by defendants under seven propositions of law, as required by our rules. We shall consider these propositions in the manner which seems to be the most logical.

The theory of plaintiff's case, as it appears from its complaint, is that on the 16th day of November, 1929, it loaned to one C. W. Ross the sum of $3,500, and took as security therefor a chattel mortgage on certain property of Ross and a continuing written guaranty executed by the Sawyer-Otondo Sheep Company, a copartnership consisting of E. J. Wolff, P. D. Etchandy, and E. A. Sawyer, hereinafter called the company, for any and all indebtedness of Ross, past, present, and future, to plaintiff up to the amount of $3,500. The consideration for such written guaranty was the loan to Ross, and the reason given to plaintiff by the guarantors for their willingness to make the guaranty was that the company was at the time indebted to Ross on the purchase of certain lands which it intended to use in its sheep business, but that not desiring to pay him the cash for such land immediately, it had arranged with him that payment might be deferred if it could obtain for him the loan from plaintiff on the faith of its guaranty, as aforesaid. The indebtedness of Ross not being paid, after plaintiff had taken all steps possible to collect it from him, this action was brought on the guaranty.

The theory of defendants, as shown by their pleadings, is that the written guaranty was executed by E. J. Wolff without the knowledge, approval, or permission of his copartner Etchandy; that it was not given for nearly a year after the loan had been made to Ross, and then was at the request of plaintiff, and relying upon its statement that the indebtedness was secured by a valid chattel mortgage which included certain grazing permits of Ross in the Federal

Reserve Forest, which would be of great value to the company if it could secure the same, so that if it was eventually compelled to make its guaranty good, it could recoup by securing the grazing permits covered by the mortgage. That when plaintiff attempted to foreclose its chattel mortgage, it appeared that the mortgage did not cover the grazing permits, so that no foreclosure could be had thereof and the consideration for the guaranty had, therefore, failed. They also claimed that plaintiff had changed the debt from an individual one of Ross to a joint one of Ross and his wife, and that this released the guarantors.

The material facts of the case, stated as we must assume them to be, are as follows: In the spring of 1929, Wolff, Etchandy, and Sawyer were copartners under the firm name of Sawyer-Otondo Sheep Company. The sole business of the company was the raising and marketing of sheep and their products, Sawyer and Wolff managing its financial business, while Etchandy's part was primarily the handling of the sheep on the range. At this time C. W. Ross was in the cattle business in a small way near the range used by the company. He had some land under lease; had initiated a homestead right on other lands; and had secured a grazing permit in the Sitgreaves National Forest for something in excess of 100 head of cattle, with the privilege of increasing the number of cattle under the rules of the Forest Service. The company believed that if it could acquire Ross' land, both leased and homestead, and particularly his forest grazing rights, they would be of considerable value to it, and had entered into some negotiations with him in regard to the matter, but he placed a price on the property higher than the company desired to pay at the time. However, on August 20, 1929, it did succeed in making a contract with him for the purchase of his lease and homestead rights, the price being fixed at

$1,500, of which $500 was paid him in advance at the signing of the contract of purchase, and the balance was to be paid when he had built a dirt reservoir on part of the land, and was able to deliver title thereto; the date of final payment thus being uncertain. Some time prior to the 16th of November, 1929, according to the testimony of R. C. Kaufman, the president of plaintiff, E. A. Sawyer, one of the partners of the company, came to plaintiff's place of business and stated that he desired to make arrangements for a loan for Ross upon the credit of the company, giving as a reason therefor that it owed Ross some money; that it was not convenient at that time for it to take it out of its bank account; that it did not wish to borrow the money directly; and that Ross would be just as well satisfied for the loan to be made in this manner as for the company to pay him immediately. Plaintiff agreed to make such loan if the company wanted to guarantee it. A few days thereafter, Ross came to plaintiff to secure the loan, and Kaufman informed Sawyer and Wolff that plaintiff was ready to go ahead with it if they were ready to make the guaranty. Sawyer said that the guaranty would be made, but that he wanted plaintiff to take a mortgage on Ross' cattle for the protection of the company, and that Ross would give plaintiff a description of the property to be mortgaged. He also stated that Wolff would sign the guaranty on behalf of the company. The terms being thus agreed on, Ross executed a note for the $3,500 and a chattel mortgage covering his cattle and range rights, and Wolff signed the guaranty, whereupon plaintiff gave Ross credit for the $3,500. The note was dated and executed on the 16th of November, 1929, the time at which the details of the loan and guaranty were finally agreed upon, while the guaranty was actually executed

on that date or a very short time thereafter. Ross failed to pay the note when it became due, and it was renewed from time to time. On July 2, 1932, the principal of the debt having at that time been reduced to $2,925, another joint and several renewal note was taken, signed by C. W. Ross and Ethel May Ross, his wife, and a new chattel mortgage to secure the same was executed by the Rosses, covering certain cattle and their brand and "all range rights and water rights." The debt not being paid, suit was finally brought against the Rosses and the company. There were two causes of action set up in the complaint, the first on the original note and mortgage and the guaranty, and the second on the renewal of 1932. Judgment was rendered against Ross individually on the original note and for a foreclosure of the chattel mortgage securing it, on the first cause of action; no judgment being taken against Mrs. Ross or the guarantors. Thereafter execution was issued and the property covered by the chattel mortgage sold for the sum of $50, which was applied on the judgment, and demand was then made upon defendants, upon their guaranty, for the payment of the amount of the judgment still due, being $3,432.92. E. A. Sawyer had died before the bringing of either action, and defendants Wolff and Etchandy, under the statute, were administering and closing up the partnership business of the company.

It is true that defendants introduced evidence controverting Kaufman's testimony in regard to the negotiations and promises leading up to the loan, and tending to show that Sawyer and Wolff had merely told him in the first place that they thought the loan was a good one, but that the guaranty had not been executed until nearly a year after the loan had been made to Ross, and then at the request of plaintiff,

and in consideration of and relying on its statement that it held as security for the loan a valid mortgage on the Forest Reserve permit aforesaid, which was worth to the company much more than the amount of their guaranty and would protect them if they were forced to pay it, and that when it appeared on the foreclosure of the chattel mortgage that it was not valid as against such permit, the consideration for their guaranty had failed and they were, therefore, not bound thereby. They also contended that none of them had consented to the taking of Ethel Ross on the renewal notes, and that such action released the guaranty. However, the jury, by its verdict, obviously adopted Kaufman's statement of the conditions under which the guaranty was given and refused to accept defendants' theory, and the evidence being in conflict, we are bound to accept the facts as necessarily found by the jury. Do these facts, as a matter of law, justify the verdict?

██ It is urged by defendants that one partner may not bind the partnership by his guaranty in its name of the debts of a third party, unless his action is either approved in advance or ratified thereafter by the other partners, or else such agreement was reasonably made in the due course of the partnership business. The rule of law as just stated is undoubtedly true in the abstract. Since it is admitted that Etchandy knew nothing whatever about the guaranty until this suit was brought, unless it appears affirmatively that it was made in the due course of the company's business, a judgment against the partnership and against him cannot stand. The company's business was the raising and marketing of sheep, and Etchandy testified that he left all of the financial arrangements in regard to its business to Sawyer. If, therefore, the guaranty was made in the reasonable

furtherance of the company's business, the partnership would be bound. Etchandy admitted that he knew generally of the negotiations in regard to the purchase of the Ross lands for the use of the partnership, and that some kind of a contract had been executed in regard thereto. We think that any reasonable method of carrying out the Ross contract would be legitimate partnership business, and that the guaranteeing of the indebtedness of Ross to plaintiff, in lieu of making a payment of cash either immediately or within the near future which would deplete the company bank account, was a legitimate business transaction within the judgment and authority of the partner managing the financial interest of the company—in this case Sawyer—to make. The jury was therefore justified on the evidence in finding that the making of the guaranty by Wolff, under the direct instructions of Sawyer, for the purpose of avoiding the necessity of an immediate or impending cash payment on the Ross contract, was binding upon the partnership and each member thereof.

██ The next question is whether the taking of Ethel May Ross as a joint maker on one of the renewal notes released the guaranty. As a general proposition, a guaranty of a specific debt of one person does not include debts on which a third person also becomes liable without the consent of the guarantor, and if the creditor takes such additional security, it releases the guarantor. Defendants contend that the taking of Ethel May Ross as a joint maker of the renewal note had the effect of changing what was originally the separate debt of C. W. Ross into a community debt without their consent and that they were, therefore, released. In support of this theory, they cite *Bank of Commerce* v. *Webster,* 70

Okl. 73, 172 Pac. 942, L. R. A. 1918F 696. In that case the guaranty relied upon read as follows:

"Sulphur, Okl., 6–19–11.

"For value received, we hereby guarantee to the Bank of Commerce of Sulphur, Okl., payment of one note of D. A. Crafton, dated 2–6–11, $1,450.00 and one note of D. A. Crafton, dated 1–30–11, $204.00, both of said notes made payable to the Security State Bank.

"C. J. WEBSTER.
"T. E. MOLACEK."

And the record shows that after the execution of the guaranty, the holder of the Crafton note had Lizzie M. Crafton, the wife of the maker of the note, sign it. The court held that this constituted a material alteration of a negotiable instrument without the consent of the parties to the guaranty, which voided the guaranty, citing many authorities in support of the holding. We think that under the facts of that particular case, the decision was correct, but that it does not apply to the present situation. It will be noted that in the case cited, the guaranty was of two definite and specifically identified negotiable instruments only and that they were changed materially. In the present case, the guaranty involved reads as follows:

"For One Dollar, to us in hand paid, the receipt whereof is hereby acknowledged, we do hereby agree upon demand to pay, or cause to be paid, to The First National Bank of Winslow, all loans, drafts, overdrafts, endorsements, accounts, checks, notes, interests, demands *and all liabilities of every kind and description now owing or which may hereafter become due or owing by C. W. Ross to said Bank,* to the amount of Thirty-five hundred and no/100 Dollars, together with all costs (including attorney's fees) of enforcing this Guaranty; and we waive notice of demand, and notice and protest of every kind, and agree that said Bank may, without notice, surrender

or release security held by it, and grant extension of time to said C. W. Ross, and may from time to time renew any obligations of said C. W. Ross without notice.

"This is a continuing guaranty.

"Witness our hands and seal this 16th day of November, A. D. 1929.

> "SAWYER–OTONDO SHEEP CO.
> "By E. J. WOLFF [Signed]"

(Italics ours.)

This guaranty is not one of any specific note or even of any specific debt, but of "all liabilities of every kind and description now owing or which may hereafter become due or owing by C. W. Ross to said bank," and it was expressly declared to be continuing in its nature. It is impossible to imagine a guaranty which is broader in its terms. In effect, it was a promise to answer for any and all debts of Ross, no matter when or how created, to the extent of $3,500. It is not a case of the guaranty of a specific negotiable instrument or debt which was afterwards altered, but the guaranty of any and all indebtedness of a certain individual, past, present, or future, no matter how evidenced or affected by another's liability, up to a certain amount. We think that the change in the form of the renewal note in no manner affected the guaranty, and the judgment offered in evidence shows that this suit was brought to enforce the payment of the balance due on a personal judgment against Ross and against him alone. It is suggested that the judgment binds the community property. But so did the original note and mortgage. Sections 2172 and 2175, Rev. Code 1928.

■ . This disposes of the two propositions of law which go to the merits of the case. There are, however, a number of others which attack the procedure

followed in the lower court. As we have said, Sawyer, one of the original partners, died before the case was filed. Kaufman, over the objections of defendants, testified to certain conversations had with Sawyer during his lifetime in regard to the transaction, and it is urged that the testimony of a third person regarding a conversation with a deceased partner, not in the presence of or known to the other partners, is not admissible nor binding on the other partners. We have a statute which declares the rule to be followed in such a case. Section 4414, Revised Code 1928, reads as follows:

"In an action by or against executors, administrators or guardians, in which judgment may be rendered, for or against them as such, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate or ward unless called to testify thereto by the opposite party or required to testify thereto by the court, and the provisions of this section shall extend to and include all actions by or against the heirs, devisees and legatees or legal representatives of a decedent arising out of any transaction with such decedent,"

and obviously covers the present situation. We have held that the admission of such testimony is within the sound discretion of the court, and that when it, in the exercise of its discretion, overrules an objection to the competency of a witness under this section, its ruling is equivalent to requiring him to testify. *Costello* v. *Gleeson,* 15 Ariz. 280, 138 Pac. 544; *Goldman* v. *Sotelo,* 7 Ariz. 23, 60 Pac. 696. We think there is nothing to show that the discretion of the court was abused, and it was not error to admit the testimony.

The next question is whether the trial court gave instructions which commented upon the facts or the evidence. It is, of course, the law in Arizona that

this cannot be done. Article 6, § 12, Constitution of Arizona; *Stephens* v. *State,* 20 Ariz. 37, 176 Pac. 579; *Lujan* v. *State,* 16 Ariz. 123, 141 Pac. 706. It is contended by defendants that the court, in its instructions, assumed as a matter of fact that there was in existence a written guaranty binding upon the partnership when, in truth, this was the vital issue in controversy between the parties. In considering whether instructions violate any rule of law, we cannot single out isolated ones nor fragments thereof and consider them alone, but must take the instructions as a whole. This is true even in criminal cases. *Faltin* v. *State,* 17 Ariz. 278, 151 Pac. 952. Much more is it the rule in civil actions. It is not considered error for the court to assume, in its instructions, matters of fact conceded at the trial or established by uncontradicted and uncontroverted evidence. 4 C. J. 1038 and cases cited. There is no dispute that there was a written guaranty executed in the name of the company by one of the partners. Whether such guaranty was binding upon him or upon the partnership was not a question of fact, but one of law, depending upon the circumstances of its execution. If the instructions in the present case are such that, taken as a whole, it was reasonable for the jury to suppose the court was expressing an opinion of whether the evidence showed facts which would, as a matter of law, make the guaranty binding, it was of course reversible error. If, on the other hand, no reasonable man would assume from the language of the instructions so taken that the court intended to express its opinion on this point, they did not violate the constitutional provision above referred to, even though certain portions thereof, standing alone, might perhaps be imagined to do so. We have examined the instructions carefully, and we cannot see

where any reasonable man could imagine that the court intended to or did express any opinion as to the existence or nonexistence of any disputed material fact in the case. That the instrument in question was in form of a guaranty and signed by Wolff was not in dispute, the question being whether such guaranty bound the partnership. Whether it did or not depended upon the purposes and circumstances under which Wolff executed it, and whether it was legitimately within the furtherance of the partnership business. Nowhere did the court express any opinion as to what the facts were in regard to these matters. It merely, in instructing the jury as to when the instrument would be binding, referred to it as a "guaranty." We think this was not a comment upon the evidence by the court, nor could it have been understood by the jury as such.

 The next objection is that the instructions were contradictory, and that the verdict was absolutely contrary to one of these instructions and so in violation of law. Apparently the objection is based on the following instruction:

"You are instructed that if you find from the evidence that plaintiff is entitled to recover from defendants your verdict should be for $3500 and such reasonable attorney's fees as the evidence warrants you in allowing. Gentlemen of the jury, there will be two forms of verdict submitted to you, the first of which will read, 'In the Superior Court of the State of Arizona, in and for the County of Navajo, First National Bank of Winslow, a banking corporation, plaintiff, vs. E. J. Wolff, P. D. Etchandy, and Sawyer-Otondo Sheep Company, etc., Verdict. We, the Jury, duly empaneled and sworn in the above entitled action, upon our oaths, do find: for the plaintiff' in whatever amount it might be.

"And the other is the same title of court and cause, 'We, the jury, duly empaneled and sworn in the above entitled action, upon our oaths, do find for

the defendants.' And the first is submitted to you for the amount not to exceed $3432.92 principal, and interest and not to exceed $800.00 attorney's fees, and costs.''

It is contended that this amounts to one instruction that if the plaintiff recovers the verdict must be for $3,500, plus attorney's fees, and another that it must be for not to exceed $3,432.92, and interest, and not to exceed $800 attorney's fees. As a matter of law, under the evidence the second instruction was correct, and the first was incorrect. The jury, however, returned a verdict for $3,163.92. Since the verdict was less than plaintiff was entitled to, if anything at all, as a matter of law we cannot see where defendants were injured thereby. The amount found was obviously a miscalculation, but since no motion was made for its correction before the jury was discharged, and since the miscalculation was in favor of defendants, the error was not prejudicial nor reversible.

 The last question is whether the conduct of counsel for plaintiff, when the jury returned into court asking for further instructions, was prejudicial error. It appears from the reporter's transcript that after the jury had been out some five hours, it returned into court and asked for further instruction. At that time defendants were represented by counsel who had not conducted the trial, a situation not uncommon when the active counsel reside in places other than the place of trial, and the jury has been out for a considerable time. The jurors asked to have the instructions read covering the mortgage and guaranty, stating the principal thing they wished to know was the amount due under the guaranty. The court informed the jury that the amount was $3,432.92, with interest and attorney's fees. One of the jurors then asked whether all of the instructions could be re-read.

It is apparent from the record that the trial judge was at that time suffering from a severe cold and was unable to read the instructions himself, so, by consent of counsel, counsel for defendants re-read them. One of the jurors was still not clear as to the proper amount of the verdict, and the court then had read the prayer of the complaint, showing a demand for $3,432.92, with interest and attorney's fees. One of the jurors was evidently confused by the fact that a certain amount had been paid upon the principal of the original indebtedness and asked for an explanation. The court stated that it could not give any information on that subject without consent of both counsel, and counsel for the defendants declined to permit the court to do so. Counsel for plaintiff then made the following statement in the presence of the jury:

"You might refer them to the one exhibit in evidence, execution and sheriff's return, to which there was added different items of cost, and then item paid on account, without expressly arguing it. That is the way the matter was arrived at. Of course, the $500.00 that was paid was paid at one time and restored at another."

And there was considerable discussion between counsel and the court in the presence of the jury, counsel for the defendants contending that counsel for plaintiff was commenting on the evidence and rearguing the case. The matter was finally settled by the court reporter re-reading certain portions of the instructions referring to the amount of the verdict.

There is no doubt that, technically speaking, counsel for plaintiff exceeded his rights in his comments and remarks during this discussion, but there is equally no doubt that upon the material matters to which he referred, the court had already instructed the jury to the same effect, with the exception of the one remark above quoted. That remark was un-

doubtedly a comment upon and an argument in regard to the evidence, but since the comment merely amounted to a summary of the undisputed facts, we think that, while erroneous, it was not reversible error.

We have discussed each one of the propositions of law set up by defendants in their brief. So far as the two going to the merits of the case are concerned, to wit, that the written guaranty admittedly given by Wolff did not bind the partnership, and that if it did, it was released by the action of plaintiff in taking an additional party to a renewal note evidencing the original indebtedness, the jury has determined that the facts which alone would make these propositions of law, though correct in the abstract, applicable to this case, are not sustained by the evidence. So far as the other five propositions which go only to matters of trial procedure are concerned, while there were undoubtedly certain errors and irregularities during the trial, we think, for the reasons above stated, they were not prejudicial to the defendants to the extent that they require a reversal of the case. Article 6, § 22, Constitution of Arizona.

There are one or two assignments of error not included under the legal propositions as stated. We have nevertheless examined them, but think it unnecessary to discuss them.

The judgment is affirmed.

McALISTER and ROSS, JJ., concur.