322 P.2d 1078

**GRAHAM COUNTY ELECTRIC COOPER-
ATIVE, Inc., Appellant,**

v.

**TOWN OF SAFFORD, Appellee.**

No. 6262.

Supreme Court of Arizona.

March 19, 1958.

Anderson & Smith, Safford, Jennings, Strouss, Salmon & Trask, Phoenix, for appellant.

Chester J. Peterson, Phoenix, Gust, Rosenfeld, Divelbess & Robinette, and Charles B. McAlister, Phoenix, Boyle, Bilby, Thompson & Shoenhair, Tucson, for appellee.

Hall, Catlin & Molloy, Tucson, Gentry, McNulty & Kimble, Bisbee, amici curiae.

PHELPS, Justice.

This is an appeal from a judgment in favor of the Town of Safford, appellee, and against Graham County Electric Cooperative, Inc., appellant, permanently enjoining the latter, its officers, agents and employees from selling and distributing electricity within the corporate limits of the Town of Safford, or attempting to expand its facilities within the corporate limits of said town.

The facts out of which the litigation arose are that Arizona General Utilities Company, an Arizona corporation, was operating in Graham County as a public service corporation under a certificate of convenience and necessity serving portions of the community with electricity for domestic and other uses. The Associated Electric Company, a Delaware corporation, owned all of the stock and the securities and long-term indebtedness of Arizona General Utilities Company. On February 8, 1946 the Associated Electric Company entered into an agreement as seller with the Graham County Electric Cooperative, Inc., the Town of Safford, and the Town of Thatcher as purchasers wherein the seller agreed to sell and the purchasers agreed to buy all the above-named assets of Arizona General Utilities Company. In the contract those assets were designated as the "closing position." This consisted of first mortgage bonds, open-account indebtedness, and 10,000 shares of common stock with no par value.

For brevity, the Associated Electric Company will hereinafter be designated as "Associated", the Town of Safford as "Safford", the Town of Thatcher as "Thatcher", The Graham County Electric Cooperative, Inc. as "Co-op" and the Arizona General Utilities Company as "AGU."

The contract of February 8, 1946, a part of the record in this case and to which

reference is made in the argument, is immaterial in this litigation except insofar as it is incidental to a contract bearing date January 22, 1946 between Co-op, Safford and Thatcher relating to the joint acquisition by them of AGU together with all of its physical assets in Graham County, Arizona. The February 8th agreement provided for their joint purchase of AGU by "position sale" from Associated upon terms and conditions therein provided which are also immaterial to a determination of the issues here involved. It is upon clause designated (2) of the contract of January 22, 1946 that this litigation must be determined. Clause (2) reads as follows:

> "It is understood and agreed that Safford and Thatcher, or either, upon the annexation or extension of their corporate limits, at any time in the future, of territory adjacent to either of said towns, shall be sold the distribution facilities then existing in any such territory and owned by the Co-op upon a *replacement new cost less depreciation basis*, with no goodwill or going concern element considered, and in no event shall the Co-op require that condemnation proceedings be instituted for such acquisition." (Emphasis ours.)

It is the position of Co-op that the contract is invalid as in violation of the Rule Against Perpetuities; that it is vague, indefinite, uncertain and incapable of enforcement; and that at most it is a contract to make a contract. On the other hand, Safford contends that the contract provides for no restraint upon Co-op from selling any of its property at any time it sees fit and that the contract therefore violates in no manner the Rule Against Perpetuities. It further contends that the contract is valid and is capable of enforcement. Co-op has raised many other questions as evidenced by its nineteen assignments of error, but they are either interwoven with the issues arising out of the portion of the contract above set forth or are without merit. We will undertake to dispose of all of them either directly or indirectly.

■ First, we are of the view that the claim of Co-op that the contract of January 22, 1946 violates the Rule Against Perpetuities is without merit. We are unable to discern any element of a violation of that rule in the terms of the contract. It places no restrictions whatever upon Co-op in the alienation of its property at any time it might desire to alienate it, nor does it provide that Co-op may not vest title thereto at any time in any one, subject only to the condition that Safford has the right to purchase it upon the happening of the contingency therein named.

■ We are also of the view that there is nothing so vague, indefinite and uncer-

tain about the contract that makes it incapable of enforcement. It is clear from the language employed that the contracting parties contemplated at the time of its execution that if and when Safford brought additional territory within its corporate limits by the legal process of annexation (which it did within two years thereafter), Co-op would sell its distribution facilities within that area *"upon a replacement new cost less depreciation* basis."

Counsel for Co-op attempted to prove by its general manager, Helmers, that the formula above set forth was ambiguous because of the fact that the word "depreciation" used therein could be figured in several different ways. He named: (1) the "straight line method"; (2) the "point of digits method"; (3) the "percentage method"; and (4) the "standard formula used by REA" which he says "differs from depreciation charged by utilities under Federal Power Commission rulings," and he added "there are a great number of methods of figuring depreciation". However, he did not give the court any enlightenment as to how any of these methods were figured or how one method differed from any of the others, nor did he state anywhere in his testimony what the variables or variations in the results would be. So far as the record in this case reveals there may not be any material difference in the final results regardless of the method employed. We have the statement of the same witness, however, that there has been a difference of opinion between Co-op and Safford as to the "replacement new cost" of poles and wires. This proves nothing except that they could not agree upon what the market price was at that time. Such a result seems to be unjustified. The most uninformed citizen in Graham County can ascertain the cost of both new poles and new wire of the type used by Co-op and also the cost of installation. There cannot be any variables or variations in the cost thereof to such an extent that reasonable men may not agree thereon.

Inasmuch as the facilities involved consist largely of wires, poles and necessary installations, certainly the court cannot experience any great difficulty in solving any problems involved from the standpoint of "depreciation." The agreement itself provides that "depreciation" shall have as its basis "replacement new cost" and not "the original cost thereof." This pinpoints the costs from which depreciation is to be deducted and removes any justifiable claim that clause (2) of the contract is ambiguous. The amount of depreciation in the instant case is dependent upon and must be determined by the useful life of the property involved and the proportion or percentage of "the useful life" of it that has been utilized by use, action of the elements of nature upon it,

and obsolescence and inadequacy, if any. The "replacement new cost", that is, the cost today including installation, is ascertained by determining what the wire and poles and other distribution facilities, if any, would cost in the open market today plus the cost of installation at present wages. Upon determining the depreciation by use of the factors above mentioned the present value of said property may be ascertained by deducting the depreciation from the "replacement new cost."

Webster's New International Dictionary (2d ed. 1949) defines "depreciation" as "a falling of value; * * * decline in value of an asset due to such causes as wear and tear, action of the elements, obsolescence, and inadequacy." In Addressograph-Multigraph Corp. v. United States, 78 F.Supp. 111, 122 note 1, 112 Ct.Cl. 201, "depreciation" is defined as "the decline in value of an asset due to such causes as wear and tear, action of the elements, obsolescency and inadequacy." In Cumberland Tel. & Tel. Co. v. City of Louisville, C.C., 187 F. 637, 653, the court defines "depreciation" as "the loss in value of some destructible property over and above current repairs." And in Downers Grove Community High School Dist. No. 99 v. Board of Educ. of Nonhigh School Dist. of DuPage County, 329 Ill.App. 208, 214, 67 N.E.2d 605, 608, the court defines "depreciation" as "a loss over and above current repairs." Nothing more complicated

than the above definitions should be required in arriving at depreciation in cases like this. Therefore there is no justification for giving to the word "depreciation" a meaning different from Webster's definition thereof which is the general acceptation of the word even by laymen. The poles and wires may have been affected somewhat by the elements but reasonable men who in good faith desire to assess their value under the above formula can do so.

No court should experience any more difficulty in arriving at replacement new cost, depreciation, and present value of such property than is encountered in the ordinary tort action in arriving at the measure of damages in any case where personal property with no market value has been damaged. In the case entitled The Manhattan, D.C., 10 F.Supp. 45, action was brought for damages to the ship "Manhattan" which had no market value. Nevertheless the court by competent evidence determined the damage to the owner and rendered judgment accordingly. The same result was achieved in Ozanic v. United States, 2 Cir., 165 F.2d 738. It also involved damages for sinking a ship which resulted from collision with another ship where the ship which was sunk had no market value. It would seem that where the property to be "replaced new" has a market value, as in this case, the task of the court in arriving at the amount of damages to be awarded the owner is far more

simple than if such property had no present market value.

■■ Counsel for Co-op sought to introduce evidence to the effect that at one time Safford offered a specific sum for the distribution facilities of Co-op in an annexed area; that this offer was accepted by the Board of Directors of Co-op; and that advice of such acceptance was given to the proper governing authorities of Safford; but that Safford refused to perform its part of such agreement. This evidence was rejected by the court and counsel then made profert thereof. This evidence should have been admitted. Its rejection was reversible error. If it had been admitted it would have been shown Safford's refusal to perform its part of the contract. It would also have refuted the claim of Co-op that the contract is too vague, indefinite and uncertain to be capable of enforcement. It would have shown they did agree on the amount due Co-op for some area taken into the city in which Co-op was furnishing electrical service. Payment of the amount agreed upon could have been enforced if pursued. Until Safford offers to pay to Co-op, or evidences, in good faith, a willingness and an ability to pay the amount due under the contract for said delivery facilities either as agreed upon by the parties or the amount which the court determines to be due thereunder, based upon their present replacement new cost less depreciation, it is not entitled to any relief against Co-op. It has neither alleged nor proved that it has offered to perform its part of the contract or a willingness and ability to perform. That the action here is in the nature of one for specific performance there can be no doubt, and therefore, the burden is upon plaintiff in such cases to both allege and prove either that he has performed or that he is able, willing and ready to perform. 49 Am.Jur., Specific Performance, § 161.

In resolving the issues here presented and under the facts of this case it is unnecessary for us to determine whether Co-op operated as a cooperative or as a public service utility requiring a certificate of convenience and necessity from the Arizona Corporation Commission. Its duties and obligations under its contract with Safford are the same in either case, and the duties and obligations of Safford to it are the same.

■ Let us observe here that there is no merit to Co-op's contention that the contract is inequitable or that it divests it of its most profitable area of service. It voluntarily agreed to sell its distribution facilities within any expanded corporate limit of Safford without consideration of good will as an element of value and expressly agreed not to require condemnation proceedings for such acquisition.

In view of the conclusion we have reached we are of the opinion that the court's findings of fact XI, XII, XIII and XVI are erroneous; that its conclusions of law II, III, V, VI, VII and IX are erroneous; and that findings of fact VII, VIII, IX and X and conclusion of law IV are immaterial under the present circumstances of this case.

The fact that Safford has paralleled the service lines of Co-op does not relieve it of its obligation under the contract to pay to Co-op the price therefor as determined by the formula set up in said contract.

The judgment is reversed with directions to grant a new trial to determine, upon proper pleadings, the present value of the delivery facilities of Co-op within the corporate limits of Safford in accordance with the pronouncements hereinabove made and to render judgment accordingly.

UDALL, C. J., and WINDES, J., concur.

JOHNSON and STRUCKMEYER, Justices (dissenting).

We are in disagreement with the majority of this court in that we believe the trial court should be directed to dismiss the action for the reason that clause 2 of the contract of January 22, 1946 is hopelessly equivocal and so indefinite that it cannot be enforced.

It is true that a contract will be given a construction which will make it valid and binding instead of that which would make it void or unenforceable; but in order to constitute a valid agreement, the parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. If an agreement be so vague and indefinite that it is not possible to collect from it the full intention of the parties, it is void; for neither the court nor the jury can make an agreement for the parties. Thomson v. Gortner, 73 Md. 474, 21 A. 371.

The majority are of the opinion that the phrase "replacement new cost less depreciation" is sufficiently certain that reasonable men cannot differ in its interpretation. This conclusion is diametrically opposed to the undisputed fact, evidenced by this prolonged and extended litigation, that the parties are not now and have never been in agreement as to its meaning. It is also opposed to the uncontradicted testimony of Howard Helmers, manager of the Co-op:

"Q. Has there ever been any agreement between the City of Safford and this defendant on the interpretation of this particular term? A. There has not."

We are able to find ample room for disagreement in the practical application of the term "replacement new cost" to the problem here. The statement in Hill v. Antigo Water Co., 3 Wis. R.C.R. 623, quot-

ed in L.R.A.1916F, 670, 671, is perhaps best illustrative of the scope of the problem.

"In connection with the determination of the cost of reproduction of the plant, a great deal of engineering work and skill is required. To begin with, it is necessary to obtain a complete inventory of the physical property. Such an inventory must ordinarily be secured by actual inspection and enumeration, aided, of course, by the records and by such other information as may be had from the company. This inventory should include not only the different parts of the property of the plant, but the amount or quantity of labor and material that were required to place it in position as a part of the completed plant. The next step in this connection consists in finding a suitable price per unit, not only of each class of property, but of the labor and material required in placing it in its proper place or position. These prices are usually those which prevail at the time, or these which constitute the average market price for the past few years. From these facts the total cost of the labor and material that enters into a plant is computed. In addition to this it is also necessary to ascertain the time required for construction in order that interest upon the cost during the construction period may be estimated, the probable cost of engineering, superintendence,

insurance, and various other factors. The sum of the cost of all those elements is usually said to constitute the cost of reproduction new."

In addition to telephone poles and wire mentioned in the majority opinion, it seems to us that there must necessarily be such items as, for example, transformers, meters, and easements and rights of way. The replacement cost of easements and rights of way can be ascertained only from the opinions of experts which often and usually vary widely. It is also possible that such items of equipment as transformers and meters cannot now be identically reproduced by reason of obsolescence or otherwise.

The majority of this court are able by definition to find a fixed meaning in the word "depreciation." It is true that the definitions tell what depreciation is, but they most certainly do not provide a formula by which it is possible to determine how the parties intended depreciation to be calculated.

"In general, there are two methods of estimating accrued depreciation of public utility property; (1) theoretical depreciation, based upon the estimated life of property; and (2) depreciation ascertained by observation and inspection. * * *" 43 Am.Jur. 659, Public Utilities and Services, Section 129.

In order that the trial court may render a judgment in this cause, it must adopt one

24

or the other, or possibly a combination of both of these methods of estimating accrued depreciation, dependent not upon the agreement of the parties, because the parties have never agreed, but upon what the court thinks the parties should or would have agreed had they considered the matter on the 22nd day of January, 1946. We do not think this is a proper function of the Court. Courts will not make a contract for the parties. We believe that in order for there to be a valid, enforceable agreement, the parties must have the distinct intention common to both and without doubt or difference, and they must both assent to the same thing in the same sense. Putnam v. Cameron, 129 Cal.App.2d 89, 276 P.2d 102. Moreover, both theoretical and observed depreciation are dependent upon opinion. Theoretical depreciation is based on an arbitrary estimation of the life of property and observed depreciation is based on inspection. Both embrace areas in which reasonable men in good faith can disagree.

We agree with the majority that the action instituted by Safford is apparently one for specific performance and that it was neither alleged nor proved that Safford had offered to perform its part of the contract or a willingness and ability to perform. It is clear that these matters should have been pleaded and proved to entitle Safford to any relief. We further disagree with the majority that Safford should be "given the second bite of the apple" and be permitted to amend its pleadings and attempt to prove a case, after failing on the first attempt.

We would reverse the judgment, dismiss the complaint and enter judgment in favor of the appellant on its counterclaim.