388 P.2d 169

### GRAHAM COUNTY ELECTRIC COOPERATIVE, INC., Appellant,

v.

### TOWN OF SAFFORD, Appellee.

**No. 7297.**

Supreme Court of Arizona,

En Banc.

Dec. 27, 1963.

Anderson & Welker, Safford, and Jennings, Strouss, Salmon & Trask, Phoenix, for appellant.

Alvin Krupp, Safford, Gust, Rosenfeld & Divelbess, Phoenix, and Boyle, Bilby, Thompson & Shoenhair, Tucson, for appellee.

STRUCKMEYER, Justice.

This appeal is subsequent to our decision, Graham County Electric Cooperative, Inc. v. Town of Safford, 84 Ariz. 15, 322 P.2d 1078, and is a continuation of that controversy. There is now questioned a judgment of the superior court awarding the Co-op $55,591.00 for its distribution facilities within the Town of Safford and damages to Safford for breach of contract by Co-op of $88,916.30.

Prior to the year 1945, the Arizona General Utilities Company served Graham County with electricity. In January of 1946, Co-op, Safford and the Town of Thatcher entered into an agreement in contemplation of the purchase of the facilities of the Arizona General Utilities Company. The agreement provided for the acquisition of all of the facilities within Graham County, Arizona, with the Towns of Safford and Thatcher acquiring those within their corporate limits and the Co-op acquiring the remainder. It also provided that the towns could purchase such facilities from the Co-op that would come within their limits by reason of future annexation of territory. Pursuant to this agreement, the facilities of the Arizona

General Utilities Company were acquired. Later Safford annexed certain areas.

Commencing in April of 1949, and thereafter, Safford advised the Co-op that it desired to purchase all the electric facilities belonging to the Co-op within the annexed areas. Meetings were held at which the parties negotiated in an effort to resolve the difficulties concerning the price to be paid by Safford but without success. Finally, in 1954, Safford filed suit seeking an injunction to prevent the Co-op from continuing to serve the annexed areas. The trial court granted the injunction and that judgment was the subject matter of the first appeal.

On appeal, Co-op asserted that clause (2) of the 1946 contract was incapable of enforcement. Clause (2) provided:

> "It is understood and agreed that Safford and Thatcher, or either, upon the annexation or extension of their corporate limits, at any time in the future, of territory adjacent to either of said towns, shall be sold the distribution facilities then existing in any such territory and owned by the Co-op upon a *replacement new cost less depreciation basis*, with no goodwill or going concern element considered, and in no event shall the Co-op require that condemnation proceedings be instituted for such acquisition." (Emphasis supplied.)

The issue was answered adversely to the Co-op, the majority of the Court then being of the opinion that "there is nothing so vague, indefinite and uncertain about the contract that makes it incapable of enforcement." It was also decided that the trial court committed error in rejecting evidence of negotiations terminating in the year 1953 from which there might have been concluded a valid offer by Co-op and an acceptance by Safford of a formula to resolve the differences as to the purchase price. The cause was reversed and remanded with directions to the trial court to ascertain the price Safford was to pay Co-op for the facilities within the annexed areas either under the purported 1953 agreement or under clause (2) of the 1946 contract.

## THE 1953 CONTRACT

On remand, evidence concerning the purported agreement of 1953 which had been excluded in the first trial was introduced. It was established that from 1948 through 1953 numerous discussions occurred between the parties as to the meaning of clause (2) of the agreement. Finally, in May of 1953, a joint meeting was held between Safford's Town Council and Co-op's Board of Directors at which it was decided to appoint committees of three from each side for the purpose of negotiating a formula to evaluate the property involved. The committees were appointed and met and at the suggestion of a Safford

member the engineering firm of Headman, Ferguson & Carollo was selected to appraise the distribution facilities sought to be purchased by Safford. The Headman firm submitted an appraisal formula which would have resulted in a purchase price of 4.121 times the annual revenue of the Co-op's facilities in the annexed areas. Co-op's Board of Directors approved and agreed to the Headman formula but the town refused to purchase on that basis.

G. A. Rhoads, manager of Safford's utilities, testified that the true purpose of the committees was solely advisory and neither committee had authority to bind their principals. He also testified that after receiving the Headman report Safford made an offer but not in conformity with the Headman recommendations. Howard Helmers, manager of the Co-op, wrote to Safford's Town Council that unless the price, 4.121 times the annual revenue, "is agreed upon as the basis for transfer of the properties there would be no further use for negotiations nor would our committee be disposed to again meet on the subject."

The foregoing stated facts did not result in a new or modified contract. Conceding what is disputed—that it was intended the committees of both the Town Council and the Co-op Board of Directors were to determine a price which would bind their respective principals—it is plain unless Safford's committee was lawfully authorized or thereafter its action was lawfully ratified no binding contract would result. Droste v. City of Highland Park, 258 Mich. 1, 241 N.W. 823.

■ The time and place of the Town Council meeting must be fixed by ordinance, A.R.S. § 9–233, and the clerk shall be caused to keep a journal of the Council proceedings and a record of all ordinances adopted, A.R.S. § 9–234. The Co-op did not establish that the Town Council met as required by law and adopted an ordinance authorizing its committee to act on the town's behalf or that thereafter an ordinance was adopted ratifying the committee's action.

"The governing body of a municipality can act validly only when it sits as a *joint* body at an authorized meeting duly assembled pursuant to such notice as may be required by law; for the existence of the council is *as a board of entity* and the members of the council can do no valid act except as an integral body. As stated by one of the text-writers, 'the general legal rule is that, to bind the municipality, the council or legislative body must be duly assembled and act in the mode prescribed by the law of its creation, evidenced by an order entered of record, and such act, if legislative in character, must ordinarily be by ordinance, by-law or resolution, or something equivalent

thereto.' McQuillin Municipal Corporation, 2d Ed., Vol. 2, Sec. 602, p. 529. * * * Unless, therefore, the members of the council formally come together, in the manner required by law, for the purpose of joint discussion, decision and action with respect to municipal affairs there can be no 'meeting' of this governing body, within the legally accepted sense of the term, for the individual or separate acts of a member or the unofficial agreements of all or a part of the members of the council are ineffectual and without binding force; joint, official deliberation and action as provided by law being essential to give validity to the acts of the council." Turk v. Richard, Fla., 47 So.2d 543, 544.

No formal action of the Town Council of Safford either authorizing or ratifying its committee's action appears in the record and hence the record is barren of evidence from which the trial court could have inferred a modified contract even if it were intended and the members of the committee believed they were authorized to settle the dispute. See also Jack v. Torrant, 136 Conn. 414, 71 A.2d 705; Universal Const. Co. v. Gore, Fla., 51 So.2d 429; Shulse v. City of Mayville, 223 Wis. 624, 271 N.W. 643.

### THE LAW OF THE CASE

 This Court held in its former opinion that

"* * * there is nothing so vague, indefinite and uncertain about the contract that makes it incapable of enforcement." 84 Ariz. 18, 19, 322 P.2d 1078, 1080.

Appellant argues that the doctrine of the law of the case does not prevent us from now re-examining our decision; that it now appears for the first time from the evidence at the second trial the choice of how appellant's facilities are evaluated makes a difference of many thousands of dollars. It is true that this state is committed to the rule that the doctrine of the law of the case is not to be considered binding under all circumstances, Sibley v. Jeffreys, 81 Ariz. 272, 305 P.2d 427. There we said in quoting with approval from England v. Hospital of Good Samaritan, 14 Cal.2d 791, 795, 97 P.2d 813:

"* * * the modern view is that it (the law of the case) should not be adhered to when the application of it results in a manifestly unjust decision."

We are not convinced that the application of the law of the case will result in a manifestly unjust decision. This dispute originated as early as Safford's first annexation in 1948, over fifteen years ago, and has been a continuing source of conflict since that time. It is desirable that there be a speedy end to litigation. The end to this litigation has been too long deferred. Cf. Fernandez v. Garza, 93 Ariz. 318, 380 P.2d

**180**

778. Unless we can now say that the application of our former decision must necessarily result in manifest injustice, we will not re-examine our former conclusions rather as a suitable alternative we will invoke the power of this Court to modify the judgment, A.R.S. § 12–2103.

## THE VALUATION OF APPELLANT'S PROPERTY

The trial court by its finding of fact No. 10 fixed the value of appellant's distribution facilities located within the annexed areas as $55,591.00, purportedly in accordance with the formula set forth in clause (2) of the agreement. We are convinced the trial court erred in its valuation but that error arises out of the application by the trial court of the facts to the pronouncements contained in the first decision.

The area of dispute is narrowed by appellant's concession that the count of poles, transformers, conductors, servicers, meters and lines is correct. It is further narrowed by the concession that the pricing by appellee of the various items to establish reproduction new cost is also substantially correct. The principal dispute in the application of the formula "replacement new cost less depreciation" arises out of the adoption by the court of the figures of the witness Charles Rollins, an engineer with the firm of John A. Carollo, Consulting Engineers, who used what is called the "straight line method" of depreciation testifying to the valuation of $55,591.00 found by the trial court. It is urged by appellant that valuation should have been fixed at a higher sum through the use of observed depreciation.

The testimony establishes that the "straight line method" of determining depreciation involves classifying articles by categories, such as poles and meters, and then determining the age of each article by applying a predetermined formula as its life expectancy and then reducing its value in the proportion that age bears to life expectancy. If, for example, a given meter had a useful life expectancy of thirty years and was fifteen years old, its value was determined by subtracting 50% of its new cost price. Rollins used a number of accounting and engineering handbooks, such as the National Association of Railroad Utilities Commission and Federal Power Commission, to establish useful life expectancy. He then added labor costs of installation.

The "straight line method" of depreciation is generally used in the determination of values for rate and tax purposes. It has an inherent weakness for purchase and sale in that it does not take into consideration that the property being evaluated may be in better condition than the national average, a point which obviously would influence prospective purchasers and affect the market price.

Appellant's principal expert witness, G. H. Wingfield, after an examination of the

facilities, testified to an over-all 90% new condition. But his subsequent testimony greatly weakened his evaluation. On cross-examination he stated that he would appraise at 90% of new cost a 17-year old transformer with a life expectancy of 30 to 35 years if it had business connected with it because that was an integral part of any value; that he would take into consideration its earning power for "any purchase of property has to be related to what the property will produce." Under clause (2) of the 1946 contract that "no going concern element be considered," the witness's evaluation did not conform with the terms of the sales agreement. Since Wingfield's evaluation was afflicted with this critical weakness, the trial judge was compelled to accept appellee's testimony through its witness Rollins even though he may have considered that the "straight line method" of depreciation reflected a supposititious condition of the property.

While Rollins testified that he predicated his appraisal on the "straight line method" of depreciation, his testimony establishes that in fact he combined the two methods to some extent by visually checking the Co-op's facilities as to weathering, aging and other pertinent matters that could be determined in the field. He testified that as to poles which did not have identifying numbers, and hence could not be dated, an attempt was made to determine by observation the general percentage condition. He acknowledged that this was "observed" depreciation since it involved the degree to which the pole had deteriorated from new condition based upon examination.

"Observed method" of depreciation has certain weaknesses which makes it impractical to be relied upon completely. The witness Rollins testified to what is obvious: "It is pretty hard to tell the condition of a pole by looking at the outside exterior. It can have heart rot, it can have butt rot, it can have faults within it due to the weather condition, all these things that are not apparent as far as observations are concerned." He also testified that there is no way to tell the condition of the inside of a transformer without taking it down from the pole and opening it up for examination which admittedly was not done by any witness.

It is our conclusion that where utility property is being purchased the "straight line method" of depreciation is improper. But neither do we think that evaluation solely by observation is necessarily the only certain way to arrive at a fair figure. The trial judge here could have reasonably concluded that the "straight line method" of depreciation reinforced by personal observation was a satisfactory method of evaluation under the circumstances of the case particularly in the light of the lack of other testimony and our conclusions concerning the further issues hereinafter discussed.

**182**

Appellant argues that the witness Rollins did not consider obsolescence and inadequacy as important factors in straight line depreciation. We said in our former decision that obsolescence and inadequacy were elements of depreciation. The testimony is to the effect that the tables of the Federal Power Commission with its averages of life expectancy used by Rollins do not allow for obsolescence and inadequacy. However, appellant cannot complain of the failure of appellee's witness to take into consideration these factors. The effect of the failure to include them, or if a value were assigned independent of the tables, would be to reduce the purchase price. By the non-inclusion of obsolescence and inadequacy the purchase price must necessarily increase and consequently the exclusion is to the appellant's benefit. Where a verdict or judgment favors an appealing party, errors will not be considered prejudicial or reversible. Costello v. Wood, 89 Ariz. 270, 361 P.2d 10; Wolff v. First Nat. Bank of Winslow, 47 Ariz. 97, 53 P.2d 1077.

Appellant argues that Rollins' testimony is based upon the assumptions that the manufacturer's date marked upon the pole was the actual period of time the asset had been in use and a similar assumption was made as to meters and transformers, and that the wire on the poles had the same date as the date on the poles and the lead-in wires had the same date as the date on the meters. But the condemnation of Rollins' testimony as being computations resulting from assumptions based on assumptions has a like application to appellant's testimony. Appellant's witnesses did not purport to rest their evaluations upon the period of time an item was actually in service. Nor is there any direct evidence that Rollins' assumption substantially affected the purchase price.

Appellant complains that the court below did not allow an amount for labor for removing the distribution facilities but only made an allowance for the cost of placing similar facilities in operation. Appellant points to the testimony of Rollins: "There is no difference in the interpretation of the words 'reproduction' and 'replacement'; to us they are similar." His testimony is sought to be discredited by referring to the Federal Power Commission handbook used in part by the witness to support his evaluation. It defines replacing or replacement as:

> "Replacing or replacement, when not otherwise indicated *in the context,* means the construction or installation of utility plant in place of property retired, together with the removal of the property retired." (Emphasis supplied.)

We think that in the context of the agreement of buying and selling the parties did not intend to remove and rebuild the facilities. Rather, the word "replacement" was

intended to mean the cost to duplicate in a new condition the existing property.

We are supported in our conclusion by the appellant's witness Wingfield who testified that if he were asked to make an appraisal of replacement cost he would do just what Rollins did. He "would make it on the estimate without tearing the property down." He further testified that knowing the property was not to be torn down he would have interpreted the word "replacement" as "reproduction".

Appellant complains that the exclusion of certain items should have been included in the purchase price as cost to Safford. We conclude that some of the items should have been included and some rejected.

■■ 1. The court below properly denied an amount for poles, transformers and services outside the annexed areas by a few feet even though their sole purpose was to serve customers within. The contract does not contemplate compensation for such and we will not draw a new contract for the parties. Young v. Border Broadcasting Co., 75 Ariz. 298, 255 P.2d 888.

■ 2. The court below properly rejected two other items: $450.00 for franchise and $750.00 for certificate of convenience and necessity. Assuming these items would be properly included in the formula, the evidence clearly establishes that the amounts are the total estimated costs of obtaining a franchise and a certifi-

cate. We have not been referred to and have not discovered evidence of the proportionate amount attributable to the facilities to be purchased by Safford.

■ 3. The court below improperly rejected three items admitted by Rollins on cross-examination as customarily included in utility appraisals. These items consist of $500.00 as interest on the cost of money during the construction period, $7,383.00 overhead cost of administration, and $1,-831.00 clearing cost for rights of ways. On the testimony of Co-op's manager Howard Helmers that overhead should be figured at 10% in addition to engineering we allow $5,792.00 rather than $7,383.00. The figure of $5,792.00 is derived from 10% of the sum of $55,591.00 plus $1,831.00 right of way clearing costs and $500.00 interest on money. We note that engineering costs of 10% were already included in the Safford appraisal of $55,591.00.

4. Safford's expert Rollins testified he did not include any amount as the cost of acquisition of easements. Co-op's testimony was that such easements were valued at $7,000.00. A literal replacement of Co-op's facilities requires the inclusion of such a cost. No overhead cost of administration on this item is allowed since the testimony indicates that it was included within the $7,000.00.

We hold the court erred by $15,123.00 in finding the sum of $55,591.00 as the pur-

chase price of Co-op's facilities. The corrected sum is $70,714.00.

## DAMAGES

By A.R.S. § 9–514, a municipality must call an election of the qualified electors who are taxpayers to determine whether a utility *or a part thereof* shall be acquired. In the former appeal we did not find it necessary to decide the question whether Safford was able to perform by reason of having complied with the statute. We said that Safford "has neither alleged nor proved that it has offered to perform its part of the contract or a willingness and ability to perform" and that it was Safford's burden to prove that it is able and willing to perform [84 Ariz. 21, 322 P.2d 1082]. The Co-op has now renewed its complaint that Safford has not at any time been able to perform and consequently damages in any amount cannot be imposed.

Safford argues that it could acquire Co-op's facilities by reason of an election in 1945 authorizing the purchase of the facilities of the Arizona General Utilities Company located within its town limits. At the election held on the 25th. of June, 1945, the taxpayers of the Town of Safford sanctioned the acquisition of the electric light and power system *within the corporate limits* and the issuance and sale of bonds in the maximum amount of $385,000.00 for the purpose of acquiring those facilities "now in place within the corporate limits

of the Town of Safford." There is nothing arising out of this authorization which implies or imports future authority in the Town Council of Safford to purchase further electric facilities either within or without the town limits in whole or in part. In order that Safford purchase other facilities it must be authorized at an election held in conformity with the statute.

In our first opinion, we held only that the contract was a valid binding contract, definite and certain in its terms. Patently it was an executory contract, the purchase price determinable by the court below. The purchase price is one of the elements of the total contract necessarily determinable before specific performance could be granted. But the determination of the price still does not permit the entry of a judgment for specific performance. The law is well settled that specific performance will not be granted unless there is mutuality of remedy, Shreeve v. Greer, 65 Ariz. 35, 173 P.2d 641. There is not and has never been mutuality of remedy. Although the purchase price has now been determined, no judgment can be entered against Safford compelling it to pay the purchase price for the reason that it has not complied with A.R.S. § 9–514.

The court erred in entering judgment directing the defendant to "forthwith cause to be transferred and conveyed to plaintiff the distribution facilities in all the areas. annexed."

■ For the same reason, the court erred in assessing damages in the sum of $88,916.30 for failure to deliver the facilities to Safford on its demand. Moreover, we directed on the first appeal:

"The judgment is reversed with directions to grant a new trial to determine, upon proper pleadings, the present value of the delivery facilities of Co-op within the corporate limits of Safford in accordance with the pronouncements hereinabove made and to render judgment accordingly." 84 Ariz. 22, 322 P.2d 1082.

Under A.R.S. § 12–2103, the Supreme Court is empowered to direct a new trial or other proceedings as justice may require. We did not at any time suggest that the lower court was authorized to assess damages under these circumstances. The posture of the case was such that no damages could flow until the purchase price was determined and Safford was able to perform and the Co-op then refused.

Judgment should be entered declaring Safford's right to purchase at the price herein established with the court below retaining jurisdiction for six months thereafter to specifically enforce the contract on a showing by Safford that it is ready, willing and able to perform.

* The Honorable JESSE A. UDALL, Vice Chief Justice, and the Honorable RENZ L. JENNINGS, Justice, having disqualified themselves, the Honorable R. C. STANFORD, Jr., Judge of the Superior Court of Maricopa County, and the Hon-

Reversed with directions to enter judgment in accordance with the views herein expressed.

BERNSTEIN, C. J., LOCKWOOD, J., and * R. C. STANFORD, Jr., and * RICHARD N. ROYLSTON, Judges of the Superior Court, concurring.